**Thomas S. and Judy L. Bixler v. James R. Bullard, et al.
Shorewell Ferries, et al.**

[769 A.2d 690]

No. 00-137

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed February 9, 2001

*William B. Miller, Jr.* and *Kevin E. Brown* of *Langrock Sperry & Wool, LLP*, Middlebury, for Plaintiffs-Appellees.

*James C. Foley, Jr.* of *Deppman & Foley, P.C.*, Middlebury, for Defendants-Appellants Bullard and Jewett.

*Norman Williams, Dennis R. Pearson* and *Robert F. O'Neill* of *Gravel and Shea,* Burlington, for Defendants-Appellants Leith, Floyd, 1759 Ltd. and Shorewell Ferries, Inc.

**Amestoy, C.J.** This appeal from a grant of summary judgment to plaintiffs arises from a dispute involving the sale of a Vermont business which began operation when Mozart was three years old.

In early 1997, defendant James Bullard entered into negotiations with plaintiffs Thomas and Judy Bixler for the sale of the Ft. Ticonderoga Ferry. The negotiations continued for approximately two years, during which time the parties entered into a "basic agreement" to execute the sale through a charitable remainder trust. Due to contentious disagreements regarding the terms of the sale, in November 1998, Mr. Bullard's attorney informed plaintiffs' attorney that he would no longer negotiate with, nor sell the Ferry to, the Bixlers. Defendant Bullard sold the Ferry to William Leith and David Floyd.[1] Plaintiffs sued Mr. Bullard, arguing that their agreement was an enforceable contract. Both parties moved for summary judgment. The trial court, finding that Mr. Bullard and the Bixlers had formed a binding contract as a matter of law, granted plaintiffs' motion for summary judgment, and motion for specific performance, requiring defendants Floyd and Leith to convey their title to, and interest in, the property. We find that summary judgment was inappropriate as factual disputes remain as to whether defendant manifested the requisite intent to be bound, and therefore, reverse and remand for a trial.[2]

---

[1] Defendants in this appeal include: James Bullard, Shorewell Ferries, Inc. (Mr. Bullard's closely held corporation), Mr. Bullard and Willem Jewett as trustees of the James Bullard Charitable Remainder Unitrust, William Leith, David Floyd and 1759 Ltd. Defendants Floyd, Leith and 1759 Ltd. (the Floyd defendants) were not defendants at the time of the trial court's grant of summary judgment to plaintiffs. The Floyd defendants were named in a second complaint filed on September 22, 1999. The Floyd defendants moved for reconsideration of the July 16, 1999 summary judgment decision, although they had not been defendants at the time it was issued. On appeal, the Floyd defendants assert that the trial court erred in denying their motion for reconsideration. We need not address this issue because our decision grants the relief requested by all defendants: a remand for trial on the merits. For clarity, we simply refer to defendant Bullard throughout the opinion, except where the Floyd defendants' interests remain distinct.

[2] Given our disposition of this case, we need not reach defendants' assertions that summary judgment was inappropriate because a material factual dispute exists as to whether plaintiffs repudiated the contract, nor do we address defendants' assertion that summary judgment was improper because the tax consequences constituted a condition precedent to the contract.

One of Vermont's oldest businesses, the Ft. Ticonderoga Ferry ("Ferry") was originally chartered in 1759. In February 1997, Mr. Bullard advertised the sale of the Ferry, which he owned "through his closely held corporation, Shorewell Ferries, Inc." The sale was to include his residence, located next to the Ferry. Mr. Bullard listed the price of the Ferry and the residence at $750,000, and stated that the sale would only be made for cash or a large down payment. The advertisement also indicated that "the owner desired to execute the sale through a charitable remainder trust, and that if such mechanism were used there could be some price flexibility."

Plaintiffs contacted Mr. Bullard in February to express their interest in purchasing the Ferry. In May 1997, Mr. Bullard sent the Bixlers a marine survey in order to establish the current market value of the ferry business. The survey included, and valued: the tug, the barge, two landings, a marine railway, a fuel dispenser/tank, an equipment shed, a shop and equipment, and a pickup truck. The parties' negotiations continued over the next several months. Prior to February 15, 1998, the Bixlers and the Bullards each met separately with a representative from St. Lawrence University to explore the tax benefits of conducting the sale through a charitable remainder trust (CRT). Both parties were informed that IRS regulations forbid prior agreements pertaining to trust property before a trust is funded.

On February 15, 1998, the parties met at Bullards' residence and entered into a "basic agreement" for the sale of the business, which Mr. Bullard outlined in "scratchy notes" as follows:

| | |
|---|---|
| I | 600,000 at 8% |
| II | Stock! |
| III | House/Stock? |
| | Shelter? |
| IV | JRB Fall '98 |

No erosion of Principal amount to taxes!

Basically Accepted
Sun 15 Feb. JRB, SPB

The parties continued to negotiate the remaining terms of the sale. In July 1998, through written correspondence, the parties explored making several changes to the proposed transaction, including the purchase of corporate assets rather than stock, and selling Mr. Bullard's residence outside of the CRT. In one such letter, dated July 14, 1998, Mr. Bixler agreed not to have a "formal and normal" business

deal due to CRT requirements, and informed Mr. Bullard that the sale of the Bixlers' car dealerships was to be completed by October 1, 1998, in anticipation of their purchase of the Ferry.

In an undated letter sent that July, Mr. Bullard responded to Mr. Bixler's letter, detailing the terms of their "basic agreement" at the February 15, 1998 meeting. The letter states, "This, according to my scratchy notes, is the basic agreement to which you and I agreed last February. On this basis I have ceased negotiations with other buyers and stopped marketing." In the letter, Mr. Bullard outlined four key aspects of the transaction, including the purchase price, the allocation of the purchase price between stock and assets, that the sale would proceed through a charitable remainder trust, and that Mr. Bullard would operate the Ferry during the 1998 season. Mr. Bullard's letter also stated, "In sum, I do not propose any changes to what I understand to be our basic handshake of 15 February. . . . Shirley and I will not consider any shift or change that would impinge negatively on our agreement."

On October 1, 1998, the Bixlers sold their automobile dealerships. On October 15, the Bullards funded the CRT with company stock, and Mr. Bullard and his attorney, Willem Jewett, were named as its co-trustees. On October 19, the Bixlers received a copy of draft contracts from attorney Jewett, which did not include reference to the pickup truck or inspection provisions. The parties met on October 21 to discuss whether the pickup truck was to be included as an asset of the business, who would pay an employee's salary through the off-season, and inspections.

The meeting was "contentious." The Bullards "perceived a statement by Mr. Bixler as a challenge to find another buyer." According to Mr. Bixler, however, the parties "felt all of [the] items were addressed and resolved at our meeting and we left having shaken hands again and apologizing for any misunderstanding, feeling that all was fine."

On October 28, defendants Leith and Floyd made a written offer to purchase the company stock from the CRT and the residence from Mr. Bullard. On October 29, attorney Jewett sent revised contract drafts to Bullard as an "offer" from the Bixlers, to reflect the parties' most recent discussions. Attorney Jewett also informed the Bixlers that they were to no longer deal with Bullard directly, that Bullard had found another acceptable buyer and that the Bixlers needed to make their intentions clear by the following week. Mr. Bixler contacted attorney Jewett that same day and stated that he and his wife

accepted the draft contracts. Attorney Jewett informed him that the draft contracts remained unacceptable to Bullard. According to Mr. Bixler, he agreed to all the revisions requested by Mr. Bullard, and made changes to the documents by hand, initialed them and sent them to attorney Jewett.

On November 2, 1998, attorney Jewett informed the Bixlers through their attorney that Bullard would no longer negotiate with them, nor sell them the Ferry. Also on November 2, Mr. Bullard and attorney Jewett, as CRT trustees, accepted and signed an agreement to sell the CRT stock and residence to Mr. Leith and Mr. Floyd.

Plaintiffs promptly brought suit in Addison County Superior Court, which granted their motion for summary judgment, finding that the parties entered into an enforceable agreement at their February 15, 1998 meeting, as "the essential elements of the contract were agreed upon." The trial court further found that as of their February meeting, both parties, including Mr. Bullard, intended to be bound. The court denied the Floyd defendants' motion to reconsider, and finding that "all of the equities favor the Bixlers," granted plaintiffs' motion for specific performance, compelling defendants to convey the property to them. The trial court refused the Floyd defendants' subsequent motion for a stay of the court's order for specific performance. This Court granted a stay in May 2000.

## I. Summary Judgment

Summary judgment is appropriate only if there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. V.R.C.P. 56(c). "Thus, if we find genuine issues of material fact, within the meaning of V.R.C.P. 56(c), we must reverse the decision granting summary judgment." *Messier v. Metropolitan Life Ins. Co.*, 154 Vt. 406, 409, 578 A.2d 98, 99 (1990). "We apply the same standard as the trial court in ruling on a motion for summary judgment." *Garneau v. Curtis & Bedell, Inc.*, 158 Vt. 363, 366, 610 A.2d 132, 133 (1992). In this case, both parties moved for summary judgment at the trial level, and thus both were entitled to the benefit of all reasonable doubts and inferences when the opposing party's motion was being judged. *Toys, Inc. v. F.M. Burlington Co.*, 155 Vt. 44, 48, 582 A.2d 123, 125 (1990).

## II. Intent to be Bound

Defendants first contend that Mr. Bullard did not intend to be bound by his preliminary negotiations with the Bixlers for the sale of

the Ferry. As the court noted in *Teachers Insurance & Annuity Ass'n of America v. Tribune Co.*, 670 F. Supp. 491, 497 (S.D.N.Y. 1987), preliminary agreements:

> cover a broad scope ranging in innumerable forms and variations from letters of intent which presuppose that no binding obligations will be placed upon any party until final contract documents have been signed, to firm binding commitments which, notwithstanding a need for a more detailed documentation of agreement, can bind the parties to adhere in good faith to the deal that has been agreed.

See also *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir. 1984).

■ What distinguishes one form of preliminary agreement from another is "the intentions of the parties and . . . their manifestations of intent." *Teachers*, 670 F. Supp. at 497. Like *Teachers*, this case turns on "whether a manifestation of preliminary assent amounted to a legally binding agreement." *Id.* Intent to be bound is a question of fact to be determined at trial. See *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 218 (Wyo. 1994); *Reprosystem*, 727 F.2d at 261; see also *Bachli v. Holt*, 124 Vt. 159, 162, 200 A.2d 263, 266 (1964) (where intent to be bound was decided by jury). "To discern that intent a court must look to the words and deeds [of the parties] which constitute objective signs in a given set of circumstances." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1986) (alteration in original) (internal quotations omitted).

As this Court has noted:

> "In determining what one party intended and the other ought to have understood, regard must be had to the situation and purpose of the parties, the subject matter and course of the negotiations.
>
> The question whether there was a contract between the parties does not depend alone upon the specified facts found but also upon the reasonable inferences to be drawn from them.

*Toys, Inc.*, 155 Vt. at 50, 582 A.2d at 126-27 (quoting *Ackerman v. Carpenter*, 113 Vt. 77, 81, 29 A.2d 922, 924-25 (1943)). The specific facts as well as any inferences to be drawn from the circumstances surrounding each individual case "may be shown by 'oral testimony or

by correspondence or other preliminary or partially complete writings.' " *Winston*, 777 F.2d at 81 (quoting Restatement (Second) of Contracts § 27 cmt. c (1981)).

In this case, defendants claim that Mr. Bullard clearly expressed his intent not to be bound until after the CRT was funded, and that Mr. Bixler knew that Mr. Bullard did not intend to be bound until after the CRT was funded. To support their claim, defendants point to several statements in Mr. Bullard's deposition and affidavits in which he stated that he "had no intention of entering into a binding contract with the Bixlers . . . at any time prior to the donation of stock to a charitable remainder trust, a point the Bixlers well understood;" both he and the Bixlers were informed by representatives of St. Lawrence University that no agreements could be made regarding the sale of the trust property; and, Mr. Bullard himself also told Mr. Bixler that they "could not establish a binding contract . . . before [the] stock was actually donated."

Defendants also cite Mr. Bixler's letter, dated July 14, 1998, in which he acknowledges, "you and the recipients of the trust have made it clear that we are unable to have a *formal* and *normal* business deal and we agreed that we are able to live by those rules." According to defendants, both parties "knew that no contract for purchase of the CRT assets could be established in the face of the IRS regulations governing establishment of a charitable remainder trust."

The Bixlers claim, to the contrary, that both parties manifested the requisite intent to be bound at their meeting on February 15, 1998. The Bixlers contend that Mr. Bullard memorialized their agreement in his "scratchy notes" and subsequent letter, which outlines the "basic agreement," and indicates that he has "ceased negotiations with other buyers and stopped marketing." Plaintiffs assert that their intent to enter into a contract was evident in their correspondence with Bullard. One such letter reads, "we are selling our entire personal and business asset base on a handshake to purchase 'our ferry' and lake home, but we are unable to consult with anyone as this is to be a *secret transaction* until the trust donation." Similarly, in Mr. Bixler's deposition he stated his intent "to have an agreement with Mr. Bullard."

Plaintiffs vigorously maintain that whatever reservations defendant Bullard might have subjectively harbored during contract negotiations, it is his acts, writings and words that must be looked to in determining whether he manifested an intent to be bound. Plaintiffs correctly note that it is a general rule of contract construction that the

language and acts of a party to a contract are to receive such construction as the other party was fairly justified in giving to them, and a defendant is not permitted at a later time to give them a different construction in consequence of some mental reservation. *Norton & Lamphere Construction Co. v. Blow & Cote Inc.*, 123 Vt. 130, 135, 183 A.2d 230, 234 (1962); *Right Printing Co. v. Stevens*, 107 Vt. 359, 365, 179 A. 209, 212 (1935). This general rule is most applicable where a trier of fact has determined that the evidence, and the inferences to be drawn from it, fairly justifies the construction given by a plaintiff to the language and actions of a defendant. Hence, the cases relied upon by the plaintiffs are distinguishable from this case as they were not decided on summary judgment, but rather heard by a trier of fact. See, e.g., *Bachli*, 124 Vt. at 162, 200 A.2d at 266; *Norton & Lamphere*, 123 Vt. at 131, 183 A.2d at 232; *Cataldo v. Zuckerman*, 482 N.E.2d 849, 853-54 (Mass. App. Ct. 1985); *North Coast Cookies, Inc. v. Sweet Temptations, Inc.*, 476 N.E.2d 388, 393-94 (Ohio Ct. App. 1984); *Mr. Mark Corp. v. Rush, Inc.*, 464 N.E.2d 586, 589-90 (Ohio Ct. App. 1983).

█ Here, our review of the record persuades us that even if facts central to this action cannot be disputed by defendant, the same cannot be said for the situation and purpose of the parties and the reasonable inferences to be drawn from the facts. *Toys, Inc.*, 155 Vt. at 50-51, 582 A.2d at 127. Although the trial court indicated that both parties manifested the requisite intent to be bound, the state of the evidence renders the question appropriate for a trier of fact. See *Bachli*, 124 Vt. at 162, 200 A.2d at 266. When viewed in the light most favorable to the party opposing summary judgment, enough conflicting facts exist regarding the parties' intent to be bound to require a remand. See *Cranbrook Investors, Ltd. v. Great Atlantic Mgmt. Co.*, 201 F.3d 435 (unpublished table decision), No. 98-2631, 1999 WL 1020534, at *3-4 (4th Cir. Nov. 10, 1999); *Wilder*, 868 P.2d at 220. A fact finder could certainly conclude on the basis of this record that defendant Bullard entered into a contract with the Bixlers, but that conclusion is not commanded as a matter of law. *Toys, Inc.*, 155 Vt. at 51, 582 A.2d at 127. Summary judgment was in error.

*Reversed and remanded.*