# Catamount Slate Products, Inc. d/b/a Reed Family Slate Products, and Fred and Suellen Reed v. Lorene Sheldon, Lee Sheldon and The Lorene Sheldon Revocable Trust

[845 A.2d 324]

No. 02-487

Present: Amestoy, C.J., Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), and Gibson, J. (Ret.), Specially Assigned

Opinion Filed December 19, 2003

*David Putter*, Montpelier, and *Stephanie A. Lorentz* of *Lorentz, Lorentz and Harnett*, Rutland, for Plaintiffs-Appellants.

*Emily J. Joselson, Kevin E. Brown* and *Abby C. Moskovitz* of *Langrock Sperry & Wool, LLP*, Middlebury, for Defendants-Appellees.

¶ 1. **Skoglund, J.** Catamount Slate Products, Inc. and its principals the Reed family appeal from a Rutland Superior Court ruling enforcing what appellees characterize as a binding, mediated settlement agreement. The trial court concluded that, at the end of their September 5, 2000 mediation, the parties had reached a binding settlement agreement. Because the Reeds lacked the requisite intent to be bound to the settlement agreement in the absence of a writing, we hold that no binding agreement was reached. We reverse and remand for further proceedings.

¶ 2. The Reeds own and operate Catamount Slate, a slate quarry and mill, on 122 acres in Fair Haven, Vermont. The appellees, the Sheldons, are also Fair Haven property owners and the Reeds' neighbors. Since 1997, the parties have been litigating the Reeds' right to operate their

slate business and to use the access road leading to the quarry. In 2000, with several legal actions pending,* the parties agreed to try to resolve their disputes in a state-funded mediation with retired judge Arthur O'Dea serving as mediator.

¶ 3. Prior to the mediation, Judge O'Dea sent each party a Mediation Agreement outlining the rules governing the mediation. Paragraph nine of the Mediation Agreement stated that:

> [a]ll statements, admissions, confessions, acts, or exchanges . . . are acknowledged by the parties to be offers in negotiation of settlement and compromise, and as such inadmissible in evidence, and not binding upon either party unless reduced to a final agreement of settlement. Any final agreement of settlement must be in writing and signed by every party sought to be charged.

The cover letter transmitted with the Agreement asked the parties to sign and return the Agreement prior to the mediation. All parties received the Mediation Agreement, but Judge O'Dea apparently failed to collect the signed mediation forms at the outset of the mediation because he could not locate them in his files.

¶ 4. The mediation was held on September 5, 2000. Judge O'Dea began the session by reaffirming the statements made in the Mediation Agreement. After ten hours, the parties purportedly reached an agreement on all major issues. Judge O'Dea then orally summarized the terms of the resolution with the parties and counsel present. The attorneys took notes on the terms of the agreement with the understanding that they would prepare the necessary documents for signature in the coming days.

¶ 5. The resolution required the Reeds to pay the Sheldons $250 a month for the right to use the access road, while the Sheldons agreed to be coapplicants on Catamount Slate's pending Act 250 permit. Payments were to commence on October 1, 2000. The parties also agreed to a series of terms governing the operation of the slate quarry, including, among other things, hours of operation, number of truck trips permitted on the access road, the amount and frequency of blasting, and the location of

---

* The mediated settlement at issue here addressed three of the four pending actions between these parties. The first was a zoning appeal and cross-appeal pending before the environmental court involving a permit allowing the Reeds to build a 3,000-square-foot mill on their property. The second was a related jurisdictional appeal before the environmental board. The third dispute was a declaratory judgment action in Rutland Superior Court in which the Reeds sought to quiet title to the portion of the access road that crosses the Sheldons' property.

seismic measurements. These terms were to be memorialized in two distinct documents, a Lease Agreement and a Settlement Agreement.

¶ 6. On September 7, 2000, two days after the mediation, the Sheldons' attorney, Emily Joselson, drafted a letter outlining the terms of the settlement and sent copies to James Leary, the Reeds' attorney, and Judge O'Dea. Within a week, Leary responded by letter concurring in some respects and outlining the issues on which the Reeds disagreed with Joselson's characterization of the settlement.

¶ 7. The parties' actions before the environmental and superior courts were in a holding pattern pending the resolution of the mediation. In response to a court order to file quarterly status reports, Leary wrote a letter to the environmental court dated September 28, 2000 stating that "[t]he mediation was successful and we appear to have achieved a global settlement resolving all outstanding issues. We presently are in the process of working out the details of the agreement and preparing the appropriate documents." Leary went on to say that once the agreements were finalized, "I anticipate that we will file the appropriate paperwork with the Court to resolve [the pending cases]."

¶ 8. On October 1, 2000, the Reeds began paying the $250 monthly lease payments, but, since the settlement agreement was not final, the parties agreed that the money would go into an escrow account maintained by the Sheldons' counsel. The check was delivered to the Sheldons' attorney with a cover memo stating, "This check is forwarded to you with the understanding that the funds will be disbursed to your clients only after settlement agreement becomes final. Of course, if the settlement agreement does *not* come to fruition, then the funds must be returned to my clients." The parties continued to exchange letters actively negotiating the remaining details of the Lease and Settlement Agreements for the better part of the next five months. Although there were others along the way, by early 2001 the only remaining issues in dispute were the location of seismic measurements and the definition of "overblast."

¶ 9. In February 2001, while drafts were still being exchanged, Christine Stannard, the Reeds' daughter, saw a deed and map in the Fair Haven Town Clerk's Office which led her to believe that the disputed road was not owned by the Sheldons, but was a town highway. The Reeds then refused to proceed any further with negotiating the settlement agreement. A written settlement agreement was never signed by either party.

¶ 10. The Sheldons responded by filing a motion to enforce the settlement agreement in the quiet title action pending in the Rutland Superior Court. The trial court granted the motion, finding that the attorneys'

notes taken at the end of the mediation and the unsigned drafts of the Lease and Settlement Agreements sufficiently memorialized the agreement between the parties and thus constituted an enforceable settlement agreement. The court conceded that, since the Lease Agreement involved an interest in land, the Statute of Frauds applied. The court circumvented the statute's voiding effect, however, by invoking the judicial admission exception. Under the judicial admission exception, a court can enforce an otherwise unenforceable oral agreement when the party against whom enforcement is sought admits the existence of the agreement. 10 R. Lord, Williston on Contracts § 27:10, at 69-70 (4th ed. 1999) (collecting federal and state cases).

¶ 11. Acknowledging that the judicial admission exception has not been recognized in Vermont, see *Chomicky v. Buttolph*, 147 Vt. 128, 130, 513 A.2d 1174, 1176 (1986) (holding that " '[o]ne may admit the sale of land by a verbal contract, and yet defend an action for specific performance by pleading the statute' ") (quoting *Couture v. Lowery*, 122 Vt. 239, 243, 168 A.2d 295, 298 (1961)), the court found it applicable under the facts of this case. The statements upon which the court relied came from the testimony of the Reeds and Leary acknowledging that an agreement had been reached at the mediation. The court then reasoned that the oral agreement here was a mediated settlement agreement, the enforcement of which courts should promote on important public policy grounds. On that basis, the court concluded that "the policy considerations supporting mediation and settlement outweigh the policy considerations supporting the statute of frauds when a party admits in court the existence of a settlement agreement reached through mediation."

¶ 12. On appeal, the Reeds argue that the Statute of Frauds precludes enforcement of their oral agreement because the judicial admission exception has not been recognized in Vermont and even if it had, the admission upon which the court relied — testimony taken from parties regarding their mediation — is inadmissible under V.R.E. 408's protection against admitting settlement negotiations. They also argue that the court erred by binding them to an unwritten, unsigned settlement agreement when the evidence shows that the Reeds did not intend to be bound by anything other than a signed agreement. Finally, the Reeds assert that they were erroneously denied the opportunity to present any evidence regarding whether the Sheldons actually owned the road in dispute.

¶ 13. The Sheldons counter that the court correctly concluded that the parties entered into a binding settlement agreement at mediation and that all subsequent negotiations constituted modifications to the original

oral agreement. They also insist that Leary's notes following the mediation satisfy the Statute of Frauds because they sufficiently memorialize the terms of the agreement in writing. Furthermore, they assert that statements from mediation, while inadmissible to prove liability or the invalidity of a claim, are admissible to prove the enforceability of the agreement.

¶ 14. When reviewing the factual findings of a trial court, we view them in the light most favorable to the prevailing party below, disregarding the effect of modifying evidence, and we will not set aside findings unless they are clearly erroneous. *Brown v. Whitcomb*, 150 Vt. 106, 109, 550 A.2d 1, 3 (1988). The findings will stand if there is any reasonable and credible evidence to support them. *Harlow v. Miller*, 147 Vt. 480, 481-82, 520 A.2d 995, 997 (1986). Our review of conclusions of law, however, is nondeferential and plenary. *Thompson v. Dewey's S. Royalton, Inc.*, 169 Vt. 274, 276, 733 A.2d 65, 67 (1999).

■ ¶ 15. The question before us is whether the oral agreement reached at mediation, when combined with the unexecuted documents drafted subsequently, constituted a binding, enforceable settlement agreement. Parties are free to enter into a binding contract without memorializing their agreement in a fully executed document. See Restatement (Second) of Contracts § 4 (1981). In such an instance, the mere intention or discussion to commit their agreement to writing will not prevent the formation of a contract prior to the document's execution. See *Bixler v. Bullard*, 172 Vt. 53, 58, 769 A.2d 690, 694 (2001) (citing *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 497 (S.D.N.Y. 1987) (preliminary agreements cover a broad range from those "which presuppose that no binding obligations will be placed upon any party until final contract documents have been signed, to firm binding commitments which, notwithstanding a need for a more detailed documentation of agreement, can bind the parties to adhere in good faith to the deal that has been agreed.").

■ ¶ 16. "On the other hand, if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1986). The freedom to determine the exact moment in which an agreement becomes binding encourages the parties to negotiate as candidly as possible, secure in the knowledge that they will not be bound until the execution of what both parties consider to be a final, binding agreement.

¶ 17. We look to the intent of the parties to determine the moment of contract formation. *Bixler*, 172 Vt. at 58, 769 A.2d at 694. Intent to be bound is a question of fact. *Id.* "To discern that intent a court must look to the words and deeds [of the parties] which constitute objective signs in a given set of circumstances." *Id.* (alteration in original) (internal citations omitted). In *Winston*, the Second Circuit articulated four factors to aid in determining whether the parties intended to be bound in the absence of a fully executed document. 777 F.2d at 80-81. The court suggested that we "consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Id.* at 80; see also *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 323 (2d Cir. 1997) (finding negotiated, but unsigned settlement agreement unenforceable because parties did not intend to be bound until document was executed). This intent can be shown through oral testimony, correspondence, or other initial or partially complete writings. *Winston*, 777 F.2d at 80; see Restatement (Second) of Contracts § 27 cmt. c (1981).

¶ 18. The language of the parties' correspondence and other documentary evidence presented reveals an intent by the mediation participants not to be bound prior to the execution of a final document. First, the Mediation Agreement Judge O'Dea sent to the parties prior to the mediation clearly contemplates that any settlement agreement emanating from the mediation would be binding only after being put in writing and signed. Paragraph nine of the Agreement expressly stated that statements made during mediation would not be "binding upon either party unless reduced to a final agreement of settlement" and that "[a]ny final agreement of settlement [would] be in writing and signed by every party sought to be charged." Further, Judge O'Dea reminded the parties of these ground rules at the outset of the mediation. The Reeds testified that they relied on these statements and assumed that, as indicated, they would not be bound until they signed a written agreement.

¶ 19. Second, the letter Leary sent to the environmental court three weeks after the mediation stated that the parties "appear" to have reached a settlement, but that they are "in the process of working out the details of the agreement and preparing the appropriate documents." This is further evidence that the Reeds believed they were in the process of negotiating the final details of the settlement agreements, but did not

consider themselves bound and willing to dismiss their claims until the "appropriate documents" were executed.

¶ 20. Even more compelling evidence of the Reeds' lack of intent to be bound in the absence of a writing is the statement in the cover letter accompanying the Reeds' $250 payments to the Sheldons' attorney saying, "This check is forwarded to you with the understanding that the funds will be disbursed to your clients only after settlement agreement becomes final. Of course, if the settlement agreement does *not* come to fruition, then the funds must be returned to my clients." This factor weighs in favor of finding that the Reeds expressed their right not to be bound until their agreement was reduced to a final writing and executed.

¶ 21. Because there was no evidence presented of partial performance of the settlement agreement, we next consider the third factor, whether there was anything left to negotiate. The trial court initially stated that the parties reached a complete agreement on all material terms at the mediation. When addressing disputes over specific terms that persisted long after the mediation, however, the court conceded that, even if an agreement was not reached on the location of seismic measurements or the definition of "overblast" at the mediation, the agreement was still enforceable because the Department of Environmental Conservation overseer could insert these terms into the agreements later. The fact that when negotiations broke down there were only a few remaining disputed issues or that DEC could have resolved them during the permitting process does not lead to the conclusion that the parties were bound at the end of the mediation. Nor does it show an intent to forgo reliance on the promise that they would not be bound to any settlement agreement prior to the execution of a final written document.

¶ 22. As stated by the Second Circuit in *Winston*, "[t]he actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing." 777 F.2d at 82 (internal quotations and citations omitted). This case is no exception. A review of the lengthy correspondence in this case makes clear that several points of disagreement and ambiguity arose during the drafting process. Beyond the location of seismic measurements and the definition of "overblast," correspondence indicates that the parties still had not reached agreement on the term and width of the lease, acceptable decibel levels and notice provisions for blasts, the definition of "truck trips," and whether all claims would be dismissed without prejudice after the execution of the agreement. Resolution of these issues was clearly

important enough to forestall final execution until the language of the documents could be agreed upon. In such a case, where the parties intend to be bound only upon execution of a final document, for the court to determine that, despite continuing disagreement on substantive terms, the parties reached a binding, enforceable settlement agreement undermines their right to enter into the specific settlement agreement for which they contracted.

¶ 23. The fourth and final factor, whether the agreement at issue is the type of contract usually put into writing, also weighs in the Reeds' favor. Being a contract for an interest in land, the Lease Agreement is subject to the Statute of Frauds and thus generally must be in writing. See 12 V.S.A. § 181(5). We also look to the complexity of the agreement to determine whether the parties reasonably could have expected to bind themselves orally. *Ciaramella*, 131 F.3d at 326 (finding an eleven-page settlement agreement containing provisions lasting into perpetuity sufficiently complex to require reduction to writing); see also *Winston*, 777 F.2d at 83 (finding same with a four-page settlement agreement including obligations lasting several years). The Settlement Agreement at issue contained numerous, very specific terms governing the detailed operation of the slate quarry and included obligations lasting for at least several years. These contracts were complex enough to warrant the expectation of a writing.

¶ 24. Finally, where "the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation." *Winston*, 777 F.2d at 83. The relationship between these parties had been caustic, and they entered mediation to attempt to resolve their many pending suits. It is not unreasonable therefore that the parties would assume this type of agreement would be in writing.

¶ 25. In conclusion, three of the four factors indicate that the parties here did not intend to be bound until the execution of a final written document, and therefore we hold that the parties never entered into a binding settlement agreement. Our conclusion is supported by the correspondence, the drafts of the agreements, and the nature of the agreements themselves. Accordingly, the order enforcing the settlement is reversed and the case is remanded for further proceedings.

¶ 26. One final note, in their brief appellants encourage us to hold that a signed writing be required to bind parties to a mediated settlement even when there is no precondition of an intent not to be bound until execution

of a final written document. We expressly decline to do so. As we reiterated here, parties to a mediated settlement are free to enter into a binding oral contract without memorializing their agreement in a fully executed document, even if they intend to subsequently reduce their agreement to writing. But, when parties communicate an intent not to be bound until they have achieved a final executed settlement agreement, oral agreements and draft provisions created during and after mediation will not alone constitute the formation of a binding contract.

*Reversed and remanded for further proceedings consistent with this order.*