Mahoney v. Howe, No. S0890-02 CnC (Katz, J., May 4, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:

MAHONEY

v.

HOWE

ENTRY

This is an action for specific performance on a contract for land. In February 2002, plaintiff buyers and defendant sellers signed an Agreement to Buy Land for "a three acre parcel of land located on Route 7 in Milton, Vermont." (Def. Mot. for Summ. J., Ex. C, Aug. 19, 2003.) After sellers balked following the May 1, 2002 final approval by the Milton Development Review Board, buyers sought to enforce their agreement. Sellers now move for partial summary judgment. They argue that the

description of the three acre property is too vague to satisfy the Statute of Frauds, which makes the agreement unenforceable.

The agreement which purchasers now seek to enforce was not created at the start of the transaction between the two parties. (Pl. Stmnt. of Facts, ¶ 1, Oct. 22, 2003.) The deal actually began in November 2001 with an oral agreement. Id. At that time, sellers accepted the purchasers' offer to buy a three acre lot that the parties would carve from sellers' fifteen acre parcel. Id. As this transaction required permits and zoning approval, purchasers and sellers agreed to split the responsibilities. Id.; (Def. Mot. for Summ. J., Ex. C, Aug. 19, 2003.) As the February agreement explains:

> Seller agrees to pay all costs incurred to subdivide a fifteen acre parcel, more or less, into two lots. Lot one to be a three acre lot and Lot two to contain the remainder of the property.
>
> Purchaser agrees to submit all permit applications to the necessary boards including the Development Review Board and Planning Commision. Purchaser will obtain necessary paperwork to obtain a septic permit, the services of a Surveyor and Site Planning Commission and the State of Vermont in order to receive approval for the subdivision and a building permit.

(Def. Mot. for Summ. J., Ex. C, Aug. 19, 2003.) Following the November oral agreement, purchasers created a map illustrating where the three acre lot was to be located. (Def. Stmnt. of Undisp. Mat. Facts, ¶ 3, Aug. 19, 2003.) Sellers approved this map, and the two parties submitted it as part of their joint, signed application to the Development Review Board. Id. In January 2002, at a preliminary hearing, purchasers learned that the property, as delineated, violated a town ordinance and would require modifications. (Pl. Stmnt. of Facts, ¶ 1, Oct. 22, 2003.)

By this time, sellers had taken up their winter residence in Frostproof, Florida.  (Def. Stmnt. of Undisp. Mat. Facts, ¶ 5, Aug. 19, 2003.)  Purchasers called sellers and informed them of the zoning wrinkle.  (Pl. Stmnt. of Facts, ¶ 7, Oct. 22, 2003.)  Purchasers proposed making some modifications that would satisfy the zoning regulations.  (Pl. Stmnt. of Facts, ¶¶ 7–11, Oct. 22, 2003.)  Soon after, the purchasers faxed the Agreement to Buy Land, which the sellers signed and returned.  (Def. Mot. for Summ. J., Ex. C, Aug. 19, 2003.)  On March 15, purchasers faxed the sellers a copy of the revised zoning application with a request to sign.  (Def. Stmnt. of Undisp. Mat. Facts, ¶ 12, Aug. 19, 2003.)  The sellers signed and returned the application, but they contend that they did not see the entire application or any maps.  Id.  Purchasers claim, however, that they informed the sellers about the details involved in revising the zoning application and received sellers approval for all changes before the plan was submitted.  (Pl. Stmnt. of Facts, ¶¶ 3, 7–11, Oct. 22, 2003.)   While sellers do not deny these conversations, they claim that they did not see a map until later.  (See generally Def. Stmnt. of Undisp. Mat. Facts, Aug. 19, 2003.)  On May 1, 2002, the Development Review Board approved the final plan for the three acre subdivision and gave notice of approval.  (Def. Mot. for Summ. J., Ex. F, Aug. 19, 2003.)  Soon after, sellers renounced the sale.  (Def. Stmnt. of Undisp. Mat. Facts, ¶ 14, Aug. 19, 2003.)

As an agreement for land, this deal comes under the Statute of Frauds, which requires that the agreement and its essential elements be in writing.  12 V.S.A. § 181(5).  Long a part of English and American jurisprudence, the Statute dates back to a 1677 British Act of Parliament entitled "An Act for the Prevention of Frauds and Perjuries."  J.Dukeminier & J. Krier, Property 561 (4th ed., 1998).  The language of that act has

remained relatively untouched and has come down to each and every state through legislative enactment or common law application.  14 R. Powell & P. Rohan, <u>Powell on Real Property</u> ¶ 880, at 81-25 (1998).  While some contracts no longer come under its purview, it continues to control in real estate transactions.  <u>Id</u>.  The purpose of this law is two-fold.  First, the Statute provides a certain amount of gravity to land transactions.  Parties must deliberate, come to an agreement, and reduce their understanding to a writing.  This promotes seriousness and certainty while providing objective evidence that the act was genuine.  <u>Chomicky v. Buttolph</u>, 147 Vt. 128, 130 (1986). Second, the Statute is an evidentiary law that functions to protect land transactions from oral and perhaps false testimony.  <u>Mason v. Anderson</u>, 146 Vt. 242, 244 (1982).  As such, the Statute functions as a shield to block the admission of contracts that require oral testimony to provide essential elements.  The contract does not have to enumerate every detail of the agreement in writing, but it must contain a satisfactory enumeration of the basic elements including: signatures, identification of the parties, a description of the property, and the price.  Powell & Rohan, ¶ 880[1][d][i], at 81-35.  In other words, the Statute of Frauds is not asserted to prove or disprove the existence of an agreement or an understanding but to measure the resulting agreement against the standards for the required elements.

As a counter-consideration, the Statute of Frauds is not a sword meant to strike down otherwise just obligations on their technical merits.  10 S. Williston & R. Lord, <u>A Treatise on the Law of Contracts</u> § 29:4, at 437–38 (4th ed., 1999).  Its application depends on a full examination of the evidence available and the risk of fraud or perjury to the parties.  <u>Id</u>.  This premise is supported by Vermont law in two ways.  First, the Statute of Frauds does not outlaw or void oral contracts per se.  <u>Troy v. Hanifin</u>, 132

Vt. 76, 80 (1974). Rather, it restricts the methods parties may use to prove the existence of an agreement. Couture v. Lowery, 122 Vt. 239, 244 (1961) (oral agreement to sell land at an auction held invalid without written proof of the agreement); see also Evarts v. Forte, 135 Vt. 306, 310 (1977) (holding that writing failed to demonstrate that parties ever came to a "first understanding" over the property to be sold). Second, the Statute is of limited application where there is evidence of an agreement. Meyer v. Furgat, 133 Vt. 265, 267 (1975) ("The seller cannot avoid his agreement by raising a question of identity that was not at issue between the parties when the agreement was made.").

In the present case, the question is what agreement should be analyzed under the Statute of Frauds. Sellers urge a strict interpretation of only the February agreement as the parties' sole written agreement. As purchasers admit, the agreement, by itself, does fail the Statute of Frauds because it describes the lot at issue solely in terms of size rather than location, landmarks, or metes and bounds. W. Allen, Sufficiency of Description or Designation of Land in Contract or Memorandum of Sale, under Statute of Frauds, 23 A.L.R.2d 63, § 21 (1952, Supp. 2004) (noting the uniformly negative view jurisdictions have about relying solely on size to describe land under the Statute of Frauds). The Statute of Frauds, however, does not necessarily lock the door to extrinsic evidence to supplement the essential elements of a written agreement. As other state courts have noted, the description of property "need not be perfectly stated; however, the contract must furnish the keys to the identification of the land intended to be conveyed." White v. Plumbing Distributors, Inc., 585 S.E.2d 135, 137 (Ga. 2003). These keys must "open the door to extrinsic evidence which leads unerringly to the land in question." Wyatt v. Pezzin, 589 S.E.2d 250, 251 (Ga. 2003).

Sellers would argue that even so, the description of "three acres of land on Route 7 in Milton, Vermont" does not, in and of itself, provide any keys to another document, and that the agreement as a whole does not reference any maps or sufficient descriptions of the property's location. This argument, however, takes a very narrow view of what constitutes the final written agreement and what reference is necessary to another document to bring it into the agreement. The February agreement must be examined in the totality of circumstances surrounding its formation and contained within the document. Williston & Lord, § 29:17, at 542 (quoting New England Dressed Meat & Wool Co. v. Standard Worsted Co., 43 N.E. 112 (Mass. 1896)). As part of an on-going process, the agreement was a snapshot of the parties' current understanding. It put down in writing what the parties had already agreed to, price, size, and conditions, and what they had done, zoning and permit work. But, it left the exact description vague because, as the parties agree, at the time the exact dimensions of the property had not been established. Thus, neither buyer nor seller intended the agreement to be their final statement on the issue. As the evidence further demonstrates, this indefinite quality was not the result of any lack of agreement between the parties but rather a function of the zoning process. By the time of the February agreement, they had already submitted a detailed map of the property subdivision with the intent that it receive approval so that the lot could be sold to the purchasers. Only after learning that the zoning laws required modification did the purchasers move to change the location of the three acres, and only to the extent necessary to satisfy the regulations.

It is the zoning process, specifically mentioned in the agreement, which directs us to a satisfactory description of the property, namely the

final application to the Development Review Board. Along with the agreement, both applications to the Development Review board carry the signatures and presumably the intent of both parties. They further detail the intent of the parties to transfer land and the specifics of its subdivision. Whether we choose to look at these applications alongside the agreement as parts of an larger integrated agreement or as extrinsic evidence incorporated implicitly by the agreement's zoning references is irrelevant. Either way, the applications and the agreement provide all of the essential elements for an agreement under the Statute of Frauds. The sole missing piece from the February agreement, an exact description of the land, is fully provided by the maps and descriptions within the second zoning application.

To then reject the February agreement on the narrow grounds that it does not make explicit reference to the application documents would fly in the face of the purpose of the Statute of Frauds and would "avoid [the] agreement by raising a question of identity that was not at issue between the parties when the agreement was made." Meyer, 133 Vt. at 267. While there is danger in relying on a vague description when the property at issue is being carved out of a larger parcel, Evarts, 135 Vt. at 310; 23 A.L.R.2d 63, at § 13, that is not the case here. The documents, without parol evidence, are linked by reference, if not incorporation, and along with the circumstances, satisfy any purpose or concern of the Statute of Frauds.

This brings us to sellers' argument that, despite their signatures, they were not aware of the details of the second zoning application. The implication is that they did not agree to the final layout of the property and would not have agreed to it if they had seen the maps. Purchasers, however, allege that they informed the sellers of what they were signing and the details of the final application. While we will presume, short of

fraud, that a signor intends to be bound by her signature, it can be a factual issue.  See, e.g., <u>Bixler v. Bullard</u>, 172 Vt. 53, 58 (2001). At this point, we will not give an opinion on the merits of sellers' argument.  Instead, they will have to show evidence to support this contention and to contradict their signatures.  <u>Bacon v. Lascelles</u>, 165 Vt. 214, 218 (1996) ("Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact . . .").

Based on the foregoing, defendants' motion for summary judgment is denied.  A hearing on the merits will be scheduled.

Dated at Burlington, Vermont_____, 2004.


_____
Judge