2003 VT 82

**Richard and Bettina Quenneville v. Thomas and Mary Buttolph, Elizabeth Campbell and Karen Houghton**

[833 A.2d 1263]

No. 02-333

Present: Amestoy, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed September 5, 2003

*Andrew Jackson,* Middlebury, for Plaintiffs-Appellees.

*Charles S. Martin* of *Martin & Associates,* Barre, for Defendants-Appellants Campbell and Houghton.

*James C. Foley, Jr.* of *Deppman & Foley, P.C.,* Middlebury, for Defendants-Cross-Appellants Buttolph.

¶ 1. **Amestoy, C.J.** Defendants Elizabeth Campbell and Karen Houghton appeal the Addison Superior Court's decision extinguishing their claim to the Buttolph Farm and its owner corporation, Buttolph Farms, Inc. Appellants Campbell and Houghton argue that the superior court erred in finding that no contractual relationship existed between them and the Buttolphs and in refusing to enforce the terms of the agreements they reached. Co-defendants Thomas and Mary Buttolph cross-appeal the decision of the superior court ordering them, as the sole shareholders of Buttolph Farms, Inc., to convey the farm to plaintiffs Richard and Bettina Quenneville based on an oral agreement for the sale of the farm. The Buttolphs argue that the

superior court erred in finding and enforcing an oral agreement between the Buttolphs and the Quennevilles for the sale of the farm. We affirm.

¶ 2. In late March 2000, cross-appellants Thomas and Mary Buttolph began negotiating with appellant Elizabeth Campbell, a Rutland accountant, for the sale of the Buttolph Farm, located in Shoreham, Vermont. Campbell met numerous times with Mr. Buttolph over the next several weeks to discuss a sale and to examine the farm's financial and tax records. Since the farm was held in "C" Corporation ownership by Buttolph Farms, Inc., upon selling the farm as real estate, the Buttolphs would incur double taxation that would consume an estimated 50% of the $500,000 sale price. During her meetings with the Buttolphs, Campbell structured an offer advantageous to both parties: she would acquire the farm by purchasing its owner corporation Buttolph Farms, Inc., paying far less than the nominal asking price in the process, while at the same time providing the Buttolphs a greater return on the sale and avoiding the double taxation incurred by selling the farm as real estate.

¶ 3. On April 7, 2000, Campbell gave Buttolph a check for $1,000 to demonstrate that, as her memo on the check said, "we're serious." On April 28, Campbell met with the Buttolphs and their accountant, John Chamberlain, to discuss the terms of the proposed deal. The parties discussed a deal in which Campbell and Houghton would purchase the Buttolph Farms, Inc. stock with an owner-financed payment of $56,000, assume $200,000 of Yankee Farm Credit debt, permit Tom Buttolph's father to remain in his trailer on the property, and continue to carry his health insurance through the corporation. Moreover, the Buttolphs would keep their cows, equipment, and the right to collect the value of Agrimark stock and USDA drought relief, expected to be worth $270,000 collectively.

¶ 4. On April 28, 2000 Tom Buttolph requested that Campbell prepare the following handwritten memo, which he signed:

4/28/00.

We agree to sell our stock in Buttolph Farms, Inc. to Karen Houghton and Liz Campbell for $56,000. This sale is after we have taken possession of the cows, the feed the equipment, except for various small equipment (Grey Matter). Details of

this deal will be stipulated in a formal agreement. To be reviewed and signed later.

T. Buttolph II

/s/ Thomas Buttolph II

On May 22, 2000 the Buttolphs' attorney sent a letter to the attorney of Campbell and Houghton denying the existence of any binding agreement between the parties. At various points in their ongoing negotiations, Campbell and Buttolph also discussed the disposition of sundry farm equipment referred to as "grey matter." Although the parties agreed that the value of the "grey matter" would be included in the overall sale price, the superior court found that their disputes about the exact items included in this list were never resolved.

¶ 5. Before the Buttolphs had started the negotiations with Campbell and Houghton, plaintiff-appellees, the Quennevilles, had looked at the farm for possible purchase. Within a few days after their April 28 meeting with Campbell, the Buttolphs began negotiating for sale of the farm with the Quennevilles. The Buttolphs and Quennevilles met as many as six times to discuss the terms and structure of the sale. The negotiations culminated in a July 6, 2000 meeting between the Buttolphs, Quennevilles, and their respective attorneys, during which, according to the superior court, the parties orally agreed to the terms of the sale. Under those terms, the Quennevilles would purchase Buttolph Farms, Inc., thereby acquiring the farm itself, by assuming approximately $200,000 of Yankee Farm Credit debt, financing through Chittenden Bank an $80,000 payment for an unmortgaged 148 acre parcel of the farm, and paying a balance of $70,000 to the Buttolphs. This last payment consisted of $5000 that the Quennevilles had already paid in cash and a $65,000 seller-financed promissory note with a rate of nine percent and a five-year balloon note. Although a written agreement was prepared by their attorneys, it was never signed, and the trial court found that only an oral agreement was reached between the parties.

¶ 6. In late May 2000, Mr. Quenneville planted corn at the Buttolph Farm at a cost of between $20,000 and $30,000. On June 8, Quenneville moved his herd of 400 cattle from New York to the Buttolph Farm. He took care of Buttolph's sixty cows for several months without getting paid for the labor. The Quennevilles also upgraded and repaired, over the course of the summer and at their own expense, the milking parlor, barn, roads, manure pit, fencing, and tenant house. Finally, at some point it was orally agreed that the Buttolphs would move out of the

main farmhouse by August 15, 2000. Based on this agreement, the Quennevilles enrolled their special-needs child in the Middlebury school district, of which Shoreham is a member. While engaged in these activities, and since the sale could not be closed while a lawsuit against Campbell and Houghton was in progress (see below), the Quennevilles began negotiating with the Buttolphs for a lease agreement. Although they paid a monthly rent of $3,000 while the case was pending, a written lease agreement was never executed.

¶ 7. On June 2, 2000, the Buttolphs filed suit in the Rutland Superior Court seeking a declaratory judgment that their agreements with Campbell and Houghton were unenforceable, as well as damages for interference with contractual relationships, abuse of process, and malicious prosecution. On June 14, Campbell and Houghton filed an answer and counterclaim seeking specific performance of their oral agreement memorialized in the note signed by Tom Buttolph. On November 7, 2000, after learning that the Buttolphs were considering a settlement with Campbell and Houghton, the Quennevilles filed a complaint in the Addison Superior Court against Campbell, Houghton, and the Buttolphs, seeking specific performance of their oral agreement with the Buttolphs, legal and equitable damages, costs, and interest. On December 1, 2000 the Quennevilles filed an intervenor complaint in the Rutland litigation, seeking the same relief as in their Addison County complaint. On February 22, 2001, Campbell and Houghton filed a third-party complaint against Buttolph Farms, Inc. On May 2, 2001, the Rutland and Addison cases were consolidated in the Addison Superior Court. A hearing on the merits was held before Judge Matthew I. Katz, concluding on January 2, 2002.

¶ 8. On March 19, 2002, the Addison Superior Court issued an entry order in which it declared that Campbell and Houghton had no enforceable contract for the purchase of the Buttolph Farm property or Buttolph Farms, Inc. stock and ordered the Buttolphs to sell the farm to the Quennevilles based on their oral contract. In relevant part, the superior court found that while the handwritten note signed by Mr. Buttolph on April 28 established the basic elements of an oral agreement with Campbell and Houghton, it also anticipated the preparation of a formal agreement at a later date. Moreover, according to the court, particular issues left unresolved were the interest rate, amount of payments, amount of a balloon note, items included in the "grey matter," security for purchasers' note, and a possible right of first refusal to be retained by the Buttolphs on a small portion of the farm. Consequently, according to the superior court, the Buttolphs

entered neither a written agreement that encompassed all the terms agreed upon, nor an oral agreement that encompassed all the terms discussed.

¶ 9. Defendants Campbell and Houghton filed a motion to reconsider on April 3, 2002. In response, the Addison Superior Court filed another entry order on May 17, 2002. In it, the court first found that, as a matter of fact, the Buttolphs never reached an agreement with Campbell and Houghton regarding the composition of the "grey matter" list. The court further found that, as a matter of law, the composition of the "grey matter" was a substantial part of the intended contract. Finally, the superior court reaffirmed its conclusion that, since Campbell's agreement with the Buttolphs was for owner financing, and since the court cannot substitute a different agreement for one the parties made, her ability to pay cash was irrelevant.

¶ 10. On June 27, 2002 the Addison Superior Court filed its judgment order extinguishing the claim of Campbell and Houghton to Buttolph Farms and Buttolph Farms, Inc., and ordering the Buttolphs to convey the Buttolph Farms premises and stock to the Quennevilles in accordance with the terms of the purchase and sale agreement drawn up at their July 6, 2000 meeting. Since the Quennevilles' New Haven, Vermont, farm was to be used as collateral in the original purchase and sale agreement, and part of that farm had subsequently been sold off to a third party, the court amended the agreed-upon collateral to consist of, in part, the remaining premises owned by the Quennevilles in New Haven, the Buttolph Farm, and other specified property. This appeal followed.

¶ 11. We will overturn the factual findings of a trial court only if they are clearly erroneous. V.R.C.P. 52. "[F]indings of fact must stand unless, viewing the record in the light most favorable to the prevailing party and excluding the effect of modifying evidence, there is no credible evidence to support the findings." *Hoover v. Hoover*, 171 Vt. 256, 258, 764 A.2d 1192, 1193 (2000). A trial court's discretionary rulings are examined under an abuse of discretion standard of review, which "requires a showing that the trial court has withheld its discretion entirely or that it was exercised for clearly untenable reasons or to a clearly untenable extent." *Vt. Nat'l Bank v. Clark*, 156 Vt. 143, 145, 588 A.2d 621, 622 (1991). A grant of the equitable remedy of specific performance is at the trial court's discretion. *Davis v. Hodgdon*, 133 Vt. 49, 53, 329 A.2d 669, 672 (1974).

## I.

¶ 12. We address first whether the superior court properly found that the Buttolphs were not contractually bound to sell their farm to appellants Campbell and Houghton. Appellants Campbell and Houghton argue that the court erred both by finding that no agreement was reached on the issues of financing, "grey matter," and a right of first refusal, and that these terms were material to an agreement. Appellants also argue that the April 28, 2000 memo signed by Buttolph is sufficient on its face to establish a contract between the parties. We affirm the superior court's findings and legal conclusions.

¶ 13. We initially examine whether the Buttolphs entered into an oral agreement with Campbell and Houghton that encompassed all the material terms discussed. We affirm the finding of the superior court that three significant terms were absent from any oral agreement reached between the Buttolphs, Campbell, and Houghton. Under the deferential "clearly erroneous" standard of review, Mr. Buttolph's testimony at trial of the constantly changing nature of the "grey matter" list is sufficient to uphold the superior court's finding that this term was never agreed upon. Similarly, the trial testimony of the Buttolphs' accountant indicated that while an agreement on the issue of the right of first refusal was perhaps within sight, it nevertheless was never reached. The superior court's finding on this issue cannot be said to be without credible evidence, is not clearly erroneous, and consequently must be upheld. See *Hoover*, 171 Vt. at 258, 764 A.2d at 1193. Finally, the trial testimony of the Buttolphs' accountant that the parties discussed the necessity of reaching a mutually agreeable interest rate in the future is sufficient to place well beyond the realm of the "clearly erroneous" the superior court's finding that financing terms were never agreed upon.

¶ 14. We also affirm the court's conclusion that the terms not agreed upon were material to the sale agreement. In *Benya v. Stevens & Thompson Paper Co.*, 143 Vt. 521, 526, 468 A.2d 929, 931 (1983), we held that since the defendant was expected to finance three-quarters of the purchase price of real estate, financing was a material and integral part of the sale contract. *Id.* Similarly, in this case, financing was indeed a material term of the proposed contract because seller was to finance one-third of the purchase price. See also *Reynolds v. Sullivan*, 136 Vt. 1, 3, 383 A.2d 609, 611 (1978) (holding interest, payment intervals, and security to be terms essential to the formation of contract). The trial court found that there was "never any agreement

as to the terms of the note — the interest rate, the amount of monthly payments, the amount of the final payment" or security on the note. Since "[v]agueness, indefiniteness and uncertainty of expression as to *any* of the essential terms of an agreement have been held to preclude the creation of an enforceable contract," *Evarts v. Forte*, 135 Vt. 306, 310, 376 A.2d 766, 769 (1977) (emphasis added), the absence of an agreement on financing precludes the formation of a contract, and thus also makes moot the remaining issue of the materiality of the "grey matter" and right of first refusal terms. Campbell and the Buttolphs did not reach "a meeting of the minds on all essential details of the proposed sale." *Benya*, 143 Vt. at 526, 468 A.2d at 931.

■ ¶ 15. Campbell and Houghton also argue that they were prepared to pay cash at the time of closing, and therefore any agreement on seller financing was not material. We agree with the trial court, however, that Campbell's willingness to pay cash at the time of closing is irrelevant to the formation of the contract where it was not discussed with or agreed to by the Buttolphs. See *Evarts*, 135 Vt. at 310, 376 A.2d at 769 ("It is never enough that the parties think they have made a contract; they must express their subjective intent in a manner that is capable of understanding."); *Norton & Lamphere Constr. Co. v. Blow & Cote, Inc.*, 123 Vt. 130, 135, 183 A.2d 230, 234 (1962) ("It is a general rule of construction of contracts that the language and acts of a party to a contract are to receive such a construction as at the time [the party] supposed the other [contracting individual] would give to them . . . [and the party] will not, at a later time, be permitted to give them a different operation in consequence of some mental reservation.").

## II.

■ ¶ 16. The Buttolphs contend that the trial court erred by concluding that the Buttolphs and the Quennevilles reached an agreement on all essential elements for the sale of the farm. As noted above, while a binding agreement need not contain each and every contractual term, it must contain all of the material and essential terms. See *Evarts*, 135 Vt. at 309, 376 A.2d at 768 ("[I]f an instrument that purports to be a complete contract does not contain, or erroneously contains, the substantial terms of a complete contract, it is ineffective as a legal document."). The existence of such an agreement is a question of fact, *Town of Rutland v. City of Rutland*, 170 Vt. 87, 90, 743 A.2d 585, 587 (1999), which depends, in part, on the reasonable inferences that may be drawn from the facts of the case. *Bixler v.*

*Bullard,* 172 Vt. 53, 58, 769 A.2d 690, 694 (2001). On appeal, we will overturn a trial court's factual finding only if it is clearly erroneous. *Milot v. Calkins,* 150 Vt. 537, 540, 554 A.2d 260, 262 (1988). The superior court determined that the Quennevilles and the Buttolphs reached an oral agreement on all material terms, including the property to be sold, total price, amount financed and terms of financing, including the interest rate, amount of balloon note, assumption of farm debt, and amount of cash payment, and the closing date. As this finding of the trial court is supported by the evidence, it is not clearly erroneous. See *id.*

¶ 17. The Buttolphs also claim that they expressed a clear intent not to be bound by the agreement, and therefore the trial court erred in enforcing the "oral dealings" of the Buttolphs and the Quennevilles. The parties' intent and their manifestation of intent distinguish a preliminary agreement that is binding despite the need for a more detailed document of agreement from a preliminary agreement that still requires a final document before the parties are bound by contract. *Bixler,* 172 Vt. at 58, 769 A.2d at 694. The intent of the parties to be bound, however, is a question of fact to be determined by examining the objective words and deeds of the parties. *Id.* Here the trial court found that the parties manifested a mutual intent to be bound by agreement. We will overturn a factual finding of the trial court only where there is no credible evidence to support it, regardless of whether there is substantial evidence to contradict it. *Agway, Inc. v. Brooks,* 173 Vt. 259, 262, 790 A.2d 438, 441 (2001). There was credible evidence presented at trial to support this finding, and therefore it must stand.

¶ 18. The Buttolphs argue that the trial court erred in ordering specific performance of the oral contract between the Buttolphs and the Quennevilles because the oral contract violated the Statute of Frauds. They argue that the Quennevilles' actions did not constitute part performance of the contract to take it out of the Statute of Frauds because such actions were entirely attributable to the Quennevilles' role as leaseholders of the property. An award of specific performance on a contract rests within the sound discretion of the trial court. *Davis v. Hodgdon,* 133 Vt. at 53, 329 A.2d at 672. An oral agreement may be removed from the Statute of Frauds contained in 12 V.S.A. § 181 if the proponent "can show that, in reliance on the agreement, he or she suffered a substantial and irretrievable change in position." *Bassler v. Bassler,* 156 Vt. 353, 358, 593 A.2d 82, 86 (1991).

Where there is an oral contract for the sale of land, a purchasing party who is in possession of the land and who makes substantial improvements to the property is entitled to specific performance of the agreement, *Gove v. Gove's Adm'r*, 88 Vt. 115, 117, 92 A. 10, 11 (1914), and this may take the oral contract out of the Statute of Frauds. *Jasmin v. Alberico*, 135 Vt. 287, 290, 376 A.2d 32, 33-34 (1977). Money payments or actions that are indistinguishable from those of a tenant responsible for the maintenance of the leased premises are not sufficient to remove the agreement from the requirements in the Statute of Frauds, however. *Id.* at 290, 376 A.2d at 34. In *Bassler v. Bassler*, 156 Vt. at 359, 593 A.2d at 86, we held that the party requesting specific performance had shown a substantial and irretrievable change in position with the following improvements: the installation of a furnace, hot water heaters, insulation, new siding, flooring, windows, and a deck; the excavation and gradation of a road to the house; the removal of a barn; and the clearing of brush around a pond. Where the party promoting specific performance repaired a back porch, had gas piped to the house, made electrical and plumbing repairs and did some landscaping, we held that these were not sufficient because the improvements were no different from those done by a tenant responsible for maintenance. *Jasmin*, 135 Vt. at 290, 376 A.2d at 34.

¶ 19.  In the case at bar, the Quennevilles had possession of the land. They moved their herd of 400 cows from New York to the Buttolphs farm in Shoreham. The trial court found that the Quennevilles made improvements and repairs to the farm property in reliance on the oral agreement for purchase of the farm, subject only to the Campbell/Houghton challenge in court. These improvements included: installing a new furnace in the house for the farmhands; upgrading the milking parlor substantially by changing motors, installing automatic takeoffs on the milking system, and fixing the air compressor, water leaks, and the crowd gate rails; repairing the road to the fields and the road to the barn; removing debris, wood, and dead animals; and repairing the overflowing manure pit and the drainage to the fields. The trial court found that the Quennevilles undertook these repairs with the understanding that they would be purchasing the property. The court observed, "The lease issue was raised . . . solely because there could be no closing until the Campbell/Houghton claim was defeated. The [unexecuted] lease never constituted any agreement or indication that there was a move away from a sale, or a failure to reach agreement on a sale." Additionally, the trial court found that the

Quennevilles registered their son, who is in a wheelchair, in the district school for Shoreham based "on the strength of the firm oral agreement to sell the farm, contingent only on defeating the Campbell/Houghton claim." The court found that this was a particularly taxing commitment that could not be undone.

¶ 20. The Buttolphs rely on *Bell v. Town of Grafton*, 133 Vt. 1, 328 A.2d 408 (1974), for their argument that the actions of the Quennevilles must be unequivocally referable to the oral agreement for sale of the farm in order to remove the agreement from operation of the Statute of Frauds. We disagree with the Buttolphs' characterization of *Bell* as requiring all acts of improvement to be "unequivocally referable" or "solely due" to the oral contract. Instead, we read *Bell* to stand for the proposition that, where there was no identifiable agreement and the improvement actions of the plaintiff were "entirely assignable to his situation as licensee from the town to use the[] premises," *id.* at 3, 328 A.2d at 409, the trial court's decision denying specific performance was not error. Significantly, the "root difficulty" for the proponent of specific performance in *Bell* was the party's failure to show a "meeting of the minds" based on an identifiable agreement. *Id.* This Court found that "[p]ossession under a purchase contract sufficient to remove the Statute of Frauds barrier was not established, and the [trial] court's decision [denying specific performance] must be sustained." *Id.* Here, unlike the situation in *Bell*, an agreement for purchase of the land existed between the Buttolphs and the Quennevilles.

¶ 21. The trial court's findings support a determination that the Quennevilles, in reliance on the agreement to purchase, suffered a substantial and irretrievable change in position. The trial court did not abuse its discretion in awarding specific performance on the oral contract.

¶ 22. Additionally, the Buttolphs claim that the trial court erred by effectively "remaking" the contract regarding the collateral securing the $65,000 seller-financed promissory note and that instead the court should have declared that the contract could not be specifically enforced due to impossibility after the Quennevilles sold part of the farm that was to be used as collateral for the $65,000 note. The Buttolphs characterize the superior court's order to convey the Buttolph Farm to the Quennevilles substantially in accordance with the terms and conditions set forth in the July 6 purchase and sale agreement as a "remaking" of the contract because of an "alteration" of the collateral securing the seller financing. We disagree. The superior court's judgment order — approved as to form by both

parties — contained a provision requiring a portion of the collateral for the $65,000 promissory note referenced in the purchase and sale agreement to consist of: "All of the lands and premises of Richard Quenneville and Bettina Quenneville, d/b/a Jentraco Farms, existing in New Haven, Vermont." The trial court found that there was an agreement that the total price of sale would be $350,000, consisting of the Quennevilles' assumption of the $200,000 Yankee Farm debt, a seller-financed $65,000 promissory note with an interest rate of nine percent and a five-year balloon, the payment of $80,000 cash, and the $5,000 already paid. The agreement provided that the Quennevilles would make monthly payments of $823 on the promissory note, and the note was to be secured by a mortgage deed to the Buttolphs on the New Haven farm.

¶ 23. The Buttolphs assert that the Quennevilles sold more than half of their New Haven farm between the time it was originally proposed as collateral and the date of the court's judgment order. We are not here, however, confronted with an instance where the trial court is remaking a contract rather than construing one. See *Vt. State Colls. Faculty Fed'n v. Vt. State Colls.*, 141 Vt. 138, 144, 446 A.2d 347, 350 (1982) ("It is the duty of this Court to construe contracts; we will neither make or remake them for the parties, nor will we ignore their provisions."). There is no representation by the Buttolphs that the "New Haven Farm" collateral set forth in the superior court's judgment order of June 27, 2002 is inadequate. Indeed, the Buttolphs argue that "[i]t is immaterial whether as a matter of fact said collateral was in fact adequate." We are unwilling to conclude that the trial court's reference to collateral substantially similar to that envisioned in the purchase and sale agreement and still adequate to secure the seller financing is a "remaking" of a contract sufficient to undo the trial court's determination that the Buttolphs and the Quennevilles reached an agreement on all essential elements for the sale of the farm. The terms and conditions of the purchase and sale agreement demonstrate that the parties contemplated and intended for the promissory note to be "secured by a mortgage deed to the Buttolphs in the amount of $65,000.00," and the court, in its order, included the mortgage deed in the description of collateral for the promissory note.

¶ 24. The Buttolphs' final argument is that the trial court erred in refusing to allow the testimony of their expert witness. We review a trial court's refusal to allow testimony of an expert witness for an abuse of discretion. *Hutchins v. Fletcher Allen Health Care*, 172 Vt.

580, 581, 776 A.2d 376, 378 (2001) (mem.). A court's decision as to the competency of an expert witness will not be disturbed on appeal unless clearly erroneous. *Turgeon v. Schneider*, 150 Vt. 268, 275, 553 A.2d 548, 552 (1988). The trial court excluded the expert testimony for two reasons: (1) because the testimony was on a question of law and (2) the moving party had not demonstrated the competence of the witness as an expert in the area of testimony. The trial court explained that the proposed expert testimony was on a question of law because it would have described the obligations of a tenant farmer under the particular agreement involved in the case or those implied by law. The court further stated that, based on this proposed testimony, the witness was not competent to testify as an expert based on his limited experience with the specific subject of the testimony. The Buttolphs have not clearly and affirmatively demonstrated that the trial court abused its discretion in excluding the admission of this expert testimony. See *Villa v. Heilmann*, 162 Vt. 543, 550, 649 A.2d 768, 773 (1994) ("court's ruling [excluding testimony of an expert witness] is not subject to revision unless the appealing party clearly and affirmatively demonstrates that such discretion has been abused . . . .").

*Affirmed.*