Cunningham v. Diemer, No. S0467-03 CnC (Katz, J., Apr. 28, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:

CUNNINGHAM

v.

DIEMER

ENTRY

Plaintiff sellers seek to enforce their legal and equitable rights following the breach of a purchase and sale agreement by defendant purchasers. Purchasers argue that sellers have waited too long under the terms of the agreement and are no longer entitled to any remedy other than the retention of the deposit. Both parties have moved for summary judgment.

For the purpose of summary judgment, the facts are as follows.

Sellers and Purchasers signed a standard purchase and sale agreement in October 2002 fixing the price at $300,000 and the closing date at January 15, 2002.[1] (Pl. Mot. for Summ. J., Ex. A, Nov. 18, 2003.) As early as December 14, purchasers began communicating with seller's broker about the price of the property and advising him that they would not be purchasing the property. (J. Diemer Aff., at ¶ 4, Jan. 4, 2004.) This was followed by at least two calls to the seller's broker on December 16 and 17 where the purchasers discussed lowering the price to $275,000 and expressing the desire that "hopefully we can work with that." ( Pl. Rep. to Summ. J., Ex. 1, Jan. 14, 2004.) On December 18, purchasers contacted sellers and advised them that they would not be purchasing the property. (J. Diemer Aff., at ¶ 5, Jan. 4, 2004.) On December 30, purchasers contacted broker by phone. (Pl. Rep. to Summ. J., Ex. 1, Jan. 14, 2004.) The message included several references to putting the deal "to bed." Id. Purchasers appeared to be unsure of whether the agreement was over. "We really haven't gotten a firm decision about whether or not [sellers] wanted to move forward or if the deal was completely dead." Id. Regardless of any confusion, purchasers sent a letter to sellers on December 31 releasing the contract deposit and expressing their intent to walk away from the contract. (Pl. Mot. for Summ. J., Ex. B, Nov. 18, 2003.) Sellers received this letter on January 3, and on January 8, they drafted a settlement letter offering to drop their legal rights against purchasers for a flat sum. Id. at Ex. C. The

---

[1] With a formation date of October 9, 2002, this closing date is apparently a misprint and was most likely intended as January 15, 2003. While neither party has raised the issue, it appears to be a good candidate for reformation. See Traveler's Ins. Co. v. Bailey, 124 Vt. 114, 118 (1964) (reformation will be liberally granted where equity allows). For our purposes, we will merely presume that the parties had fixed a closing date and that it was sometime after December 2002.

letter gave purchasers until the afternoon of January 14 to accept the settlement.  Purchasers apparently did not receive this offer until January 15 when they also did not close on the property.  Id.  On January 29, the sellers sent written notice to the purchasers that they intended to pursue a lawsuit for damages stemming from purchasers' breach.  Id. at Ex. D.

According to paragraph 20 of the sale agreement, sellers, as the non-defaulting party, had the right to either keep purchasers' deposit as a remedy or elect to pursue legal and equitable remedies.  If they chose to sue, however, sellers needed to notify the purchasers of this choice in writing, in accordance with the formal notification procedures of paragraph 29, within 30 days of the notice of default.  The question raise by both parties is whether purchasers actions on December 14 or 18 qualify as notice of default such that sellers' remedy election clock was started. Purchasers urge the conclusion that either date constitutes a breach under the purchase and sale agreement.  This conclusion is untenable, however, in light of summary judgment.  Looking at the facts in a light most favorable to the non-moving party, we have to infer that these conversations, in conjunction with the phone messages left with the broker, were part of an on-going attempt to renegotiate the price rather than an outright breach. Boulton v. CLD Consulting Eng'rs, 2003 Vt. 72, ¶ 11 (motions for summary judgment require all inferences to be given to the non-moving party).  As such, the conversations hardly comprise a breach of the agreement.  Together with the phone messages, the purchasers appear as late as December 30 to believe themselves to be still bound by the agreement.  Whether this was truly the intent of the purchasers is a material fact that remains for the fact finder to decide.

On the other hand, the sellers argue that purchasers mere intent not to perform does not constitute a default as defined in the agreement.  This

depends on the meaning of the word default.  As a contract term, its interpretation is for the court to decide as a matter of law.  <u>Vermont Nat'l Bank v. Chittenden Trust Co.</u>, 143 Vt. 257, 266–67 (1983).  We will look to the plain meaning of the word and the intent of the parties intended by its meaning.  <u>Congdon v. Auto. Club Ins. Co.</u>, 174 Vt. 586 (2002) (mem.).  Black's defines default as "the omission or failure to perform a legal or contractual duty."  Black's Law Dictionary 376 (5th ed. 1979).  This is supported by other decisions that have dealt with the term explicitly.  <u>Masssachusetts Mun. Wholesale Elec. Co. v. Town of Danvers</u>, 577 N.E.2d 283, 294–95 (Mass. 1991) (discussing the effect of a parties' agreement on the meaning of "default").  The only context for default provided by the agreement is the first sentence of the paragraph, which states, "If Purchaser fails to close as provided herein, or is otherwise in default . . ."  <u>Id</u>.  A fair reading of this phrase would equate default with the failure of the purchaser to close on the property or an equal material failure or omission.  Thus, we conclude that the use of the word default—as opposed to a mere "breach"— creates a higher standard for the parties.  Rather than a mere defect, default in the agreement suggests a substantial non-performance.

In this case, the parties, already bound by the contract, began communicating in December.  The purchasers expressed their concerns and desire not to continue with the contract at the current price.  This escalated as purchasers professed a growing desire to walk away from the deal.  Still, neither party was due to perform or owed each other an obligation until the closing.  While we give short shrift to sellers argument that purchasers needed to follow the formal notice procedures of paragraph 29 to announce their default, we do conclude that default requires something more substantial than counteroffers and equivocation.  By definition, it requires a failure or omission of a contractual duty.  Thus, when purchasers declared that they did not want to close on the property, they expressed a desire not

to fulfill their contract obligations, but they did not actually fail or omit such a contractual duty. Sellers waited until the closing. Then, considering the purchasers in default, sellers elected to pursue legal action for damages.

Still, paragraph 20 only appears to require notice of default. At the very least, this means that purchasers must give sellers a clear and unequivocal notice of their intent to leave the contract and not perform under any circumstances. Given that on December 30 the purchasers were still expressing interest in the possibility of a deal, it is not until the December 31 letter that sellers have unequivocal notice of purchasers' intent not to perform, which is not contradicted by any evidence. To assign notice of default to any earlier time would be to declare notice of default before the party fully manifested their intent not to perform. Such a conclusion would discourage candor in real estate transactions. If a party, by admitting it was unable to pay a purchase price, knew that it would be subject to default, it would wait until closing to announce its position. Without the shadow of default, parties are free to negotiate up to the time of performance and can be honest about their situations without fear of default and its accompanying legal consequences. In this case, the purchasers may have made up their minds early in December that they were not going to purchase the property, but their subsequent actions gave sellers a mixed message. Notice of default must be more substantial than mere unspoken or garbled intent by a party. See Quenneville v. Buttolph, 2003 Vt. 82, ¶ 15 (unspoken or unclear mental intentions have no meaning in the law of contracts). We conclude that sellers did not receive notice of the intended default until at least January 3. Therefore, sellers' letter on January 29, electing to pursue legal damages, was timely under paragraph 20 of the agreement.

Based on the foregoing, plaintiffs' motion for summary judgment is

granted and defendants' motion is denied.

Dated at Burlington, Vermont_____, 2004.


_____
Judge