Sahlman v. Lane, No. 813-12-02 Wncv  (Katz, J., Feb. 23, 2005)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                  SUPERIOR COURT
Washington County, ss.:                          Docket No. 813-12-02 WnCv


SAHLMAN

v.

LANE


ENTRY


        This is an action between Plaintiffs Robert Sahlman, and his son Joshua Sahlman, and Joshua's one-time girlfriend, Defendant Jennifer Lane (now Moyer), to determine ownership of real estate purchased jointly by Joshua and Jennifer.  It is asserted that Father lent them some money to purchase the property.  About the time they first separated, Joshua quitclaimed his interest to Jennifer, although by an unwitnessed, unrecorded instrument.  They briefly reunited, and then finally separated.  After the final separation, Joshua quitclaimed his interest to Father, who recorded this second deed.

        We start our analysis of this problem by rejecting a substantial subject of discussion in the legal memoranda–whether Joshua knew or understood what he was doing when he executed the first quitclaim deed.  It is irrelevant.  The uncommunicated mental reservations of a party to a

contract simply are not relevant.  Quenneville v. Buttolph, 2003 VT 82, ¶ 15.  The fact that Joshua may not have well understood the import of what he signed and acknowledged is not the issue.  There is no meaningful proof, or even argument, that he lacked the legal competence effectively to contract, much less that he was induced to execute the deed by fraud.  One hundred fifty years ago, probably a good portion of the persons executing deeds and mortgages in Vermont's land records could not read.  See, e.g., Willard v. Pinard, 65 Vt. 160, 163 (1892) (concluding a husband and wife "uneducated in knowledge of books and of the art of reading and writing" nevertheless competent to contract).  Today, if there is anyone alive who fully comprehends the significance of a habendum clause, or a warranty of title, that person probably enjoys a lonely status.  Contracts and deeds between those legally competent are enforced as written, not reformed by the relative intelligence of one or the other signatory.  "[T]he understanding of the parties must be deemed to be that which their own instrument declares."  Haklits v. Oldenburg, 124 Vt. 199, 202 (1964).

The deed, signed and acknowledged by Joshua, was required to be witnessed, though it was not.  See 27 V.S.A. § 341(a) (amended, see 2004 Supplement, to eliminate the witness requirement altogether, though not retroactively to this case, which was filed before November 1, 2004).  Though defective for this reason, the deed nevertheless is "evidence tending to show an agreement on part of the grantor[] to execute a valid deed." Sheldon Slate v. Kurjiaka, 124 Vt. 261, 267 (1964); see also Black River Assoc., Inc. v. Koehler & Dion, 126 Vt. 394, 399 (1967) ("Equitable title must be respected by the parties to the sale, and by every subsequent purchaser who has notice of it.").  Although effective as between the parties to the instrument, lack of a required witness or acknowledgment may render it by itself insufficient to constitute notice requiring a subsequent purchaser to investigate the true ownership.  Day v. Adams, 42 Vt. 510, 515 (1869).  But any subsequent purchaser may be put on notice to examine the grantee's claim, such as by that grantee's act of possession of the property.  See

Gilchrist and Chamberlin v. Van Dyke, 63 Vt. 75, 78 (1890). The phraseology of "subsequent purchaser" suggests "innocent purchaser for value." There is no reason to believe Joshua's father enjoyed the latter status. There is no assertion or evidence that he gave any consideration, other than the vague statement that Joshua was indebted to his father. Nor is there evidence that Father believed he was acquiring anything more than a one-half joint interest with the Jennifer. Father concedes Joshua revealed he had signed something over to the estranged Jennifer, thereby putting Father on notice to engage in inquiry prior to receipt of Joshua's second-in-time quitclaim. See Hemingway v. Shatner, 152 Vt. 600, 602 (1989) (subsequent purchaser with notice of prior contract takes subject to first purchaser's equity). Of course, Father at all times knew she remained in possession. Further, the facts in the record show that Father knew it was a two-unit dwelling, the second of which was rented out, thereby permitting the fair inference that Jennifer alone was receiving the rent.

Vermont law has long recognized the concept of inquiry notice. See, e.g., Mortgage Lenders Network–USA v. Sensenich, 2004 VT 107, ¶ 9; Meyers v. LaCasse, 2003 VT 86, ¶ 27 ("if a party has 'sufficient facts concerning [another's] interest in the property to call upon him to inquire, he is charged with notice of such facts as diligent inquiry would disclose'"). "The duty imposed by inquiry notice arises 'when such information is known which would prompt a person exercising reasonable care to acquire knowledge of the fact in question.'" Pomfret Farms Ltd. v. Pomfret Associates, 174 Vt. 280, 287 (2002) (quoting Tomasi v. Kelley, 100 Vt. 318, 323 (1927)). Here, Father's memorandum tells us that "Sometime around January or February, 2000, Joshua informed his father, Robert, that he signed a document authorizing Jennifer 'to take care of the property while he was gone.'" Pltfs' Summary Judgment Mem., 3; Pltfs' Stmt. of Undisputed Fact, ¶17. Although Father's present recitation suggests that Joshua did not know the nature of the instrument, it does not tell us whether or not Joshua told his father "I don't really know what I signed." But

3

whether Joshua revealed his ignorance, thereby surely putting Father on notice of an instrument of uncertain contents, or was merely silent, we conclude that inquiry notice was triggered. If a party,

> had sufficient facts concerning the [adversary's] interest in the property to call upon him to inquire, he is charged with notice of such facts as diligent inquiry would disclose.
>
> No rule can be established to determine what facts are sufficient to require further inquiry. It was appropriate to inquire of the [adversary] who appeared to be in possession. Under the circumstances it was equally important to inquire of the seller. And a failure to do so has been regarded as a lack of due care.

Black River Assoc., 126 Vt. at 399-400 (citations omitted). Here, had Father inquired of Joshua, at the least he would have learned that Joshua really had no idea of what he had signed. That alone triggered the duty to inquire.

We therefore conclude that Joshua's unwitnessed and unrecorded quitclaim to Jennifer was at all times effective, as between the two of them. It also is effective as to Joshua's father, who was on inquiry notice to ascertain the facts of his son's title or equity purportedly conveyed in the second deed. For failure to have made such inquiry, Father may neither benefit from his ignorance of the facts or gain the advantage of first recordation.

Summary judgment granted for Defendant and against Plaintiffs. Counsel for Defendant to draft declaratory judgment appropriate for recording.

Dated at Montpelier, Vermont, _____, 20__.

4

_____
Judge