Dinerman v. Santiago, No. 505-9-04 Wncv (Katz, J., Aug. 17, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


STATE OF VERMONT                                                SUPERIOR COURT
Washington County, ss.:                                 Docket No. 505-9-04 WnCiv


DINERMAN

v.

SANTIAGO and ELITE LIFESTYLE


FINDINGS OF FACT
CONCLUSIONS OF LAW
NOTICE OF DECISION


        This matter was tried to the court on August 10, 2005.  On the basis of the evidence presented, the following decision is announced.

FINDINGS OF FACT

1.        The parties entered into a contract on March 14, 2004 for the construction and installation of a sunroom.  Defendant is in the business of fabricating and installing sunrooms.  The contract envisioned a total price of $18,600, and called for a "deposit with order" of $6,000.

2.    Santiago took very preliminary measurements of Plaintiffs' home on that first, March, visit, and began to draw up plans to meet Plaintiffs' requirements. The contract calls for installation to "begin around May 10 and . . . be completed on or about May 30."

3.    As events unfolded, Santiago proved not very good at returning telephone calls. Nevertheless, the project continued on its course. Around April 10, a preliminary drawing was prepared by Defendants showing the proposed new room. Santiago had told Mr. Dinerman that the preliminary drawing would be delivered in two weeks, presumably from the mid-March date, although that is not part of the written contract. He also said that he would obtain the town building permit.

4.    Although Defendants started to fill out the permit application, Plaintiffs, as property owners, needed to sign it, so the application was forwarded to them. Mr. Dinerman then completed it, signed it, and brought it to the Fayston town office. The permit eventually was issued, though with a condition on its face stating that it would become effective fifteen days after issuance to allow interested persons time for appeal.

5.    After the preliminary drawing was discussed between the parties, Defendants on May 16 prepared a "final" drawing. This was based on a site visit on May 10 by Santiago and his assistant, Brian, at which they took measurements and had detailed discussions with Dinerman. There is no doubt that the parties expected the work to continue at the time of the meeting. Dinerman also raised several substantial additions in his discussions of May 10, including outside fire stairs and french doors. Defendants apparently quoted the additional work at $4,288. The final drawing was sent to Dinerman for signature, and he did, indeed, sign it.

6.    In addition to signing the May 10 final drawing, Dinerman had his attorney-friend send a letter to Defendants. Although purporting to review the contract agreement, this letter proposed a substantial alteration of the terms. The stairs would be included within the original contract price. There would be a penalty for failure to complete on schedule. The schedule of payments was changed to be significantly less "front loaded" than the

schedule incorporated in the signed contract. These changes were rejected by Defendants, with Santiago saying his "clients don't tell him how to run his business."

7. By mid-May, Defendants had fabricated the components of the sunroom in accordance with the May 10 drawing. It was ready to be installed.

8. On May 19, Santiago called Dinerman to say that he had a crew ready to go to the job site from Maine. Dinerman rejected this offer to commence installation, telling Santiago not to send the crew. Dinerman's reason was that the period for appeal of the town permit still had two days to run, so construction could not commence for another two days. We find credible Santiago's explanation that his crew would have had to set up and reconnoiter the job site. This project was somewhat complex, because the terrain is very steep and rocky. The crew would have to make a final determination of exactly where to put piers and supports for the underside of the deck, upon which this sunroom was to be constructed. We are persuaded that there was sufficient set-up work for the crew, before any changes were made to the site, that they could have profitably used the two days, yet not commenced construction until the permit actually took effect—May 22.

9. Although Dinerman altered the "final" drawing to indicate that doors were to open out, we find that change to be inconsequential, as Defendants could readily alter their existing components to have doors swing out, rather than in.

10. On May 26, Dinerman sent his attorney's letter with proposed new contract terms.

11. The parties never got this arrangement back on track. The room was never installed. The fabricated parts were either discarded or reused in other jobs.

CONCLUSIONS OF LAW

1.      Generally, where a contract is unambiguous, its interpretation is a matter of law for the court to declare. John A. Russell Corp. v. Bohlig, 170 Vt. 12, 16 (1999). When ambiguities are present, the contract terms become a matter of fact to be determined on the evidence. Id. If contract language appears to be ambiguous, we attempt to resolve the ambiguity by examining "the whole instrument, attempting to determine the intent of the drafters from all of the language and using relevant construction aids." Kipp v. Chips Estate, 169 Vt. 102, 107 (1999). We may assess extrinsic evidence in determining whether there is an ambiguity. Id.; see generally Isbrandtsen v. North Branch Corp., 150 Vt. 575, 577-79 (1988) (discussing in detail the role of extrinsic evidence in the determination of an ambiguity). Here, we perceive no ambiguity and neither party contends that any ambiguity requiring the admission of parole evidence exists. The subjective beliefs, or other uncommunicated understandings, of either party are irrelevant. Quenneville v. Buttolph, 2003 VT 82, ¶ 15.

2.      "An enforceable contract must demonstrate a meeting of the minds of the parties: an offer by one of them and an acceptance of such offer by the other. To be valid, an offer must be one which is intended of itself to create a legally binding relationship on acceptance." Starr Farm Beach Campowners Assoc., Inc. v. Boylan, 174 Vt. 503, 505 (2002) (citations omitted). That is, once the parties have a contract, neither party thereto is permitted as of right to demand a change in terms. Despite their valid contract, however, such a unilateral demand to change the terms is implicit in the lawyer letter of May 26.

3.      We understand Plaintiffs' characterization of the original $6,000 deposit as "earnest money" to be intended to imply that it was just a sign of good faith that could be refunded on request, and was not intended to be a deposit towards the contract price. We do not believe that the expression "earnest money" is a term of art with an accepted meaning so specific as to require a particular result merely upon its utterance, apart from the actual terms of the contract in which it appears. As one court has noted, the expression "is of ancient origin. . . . [and] has given rise to many controversies . . . ." Nosacka v. McKenzie, 54 So. 351, 352 (La. 1911).

Generally, courts analyze the meaning of "earnest money" deposits in the same manner as other types of deposits, by ascertaining the intent of the parties from the language actually used in the unambiguous contract, like other ordinary contract terms. See generally, e.g., Balata Development Corp. v. Reed, 548 S.E.2d 668 (Ga. App. 2001) (analyzing earnest money deposit agreement with ordinary rules of contract interpretation).

Of course, here, the contract makes no mention of "earnest money"; it says "deposit with order." It also states a "balance due" that represents the total contract price less the deposit amount. Without more, in these circumstances, we have no doubt but that the deposit was intended to be a partial payment on the total contract price, made to guarantee Plaintiffs' performance, not refundable "earnest money." The Washington Supreme Court said of a similar deposit: "That it was to be a partial payment is apparent from the following language . . .: 'Balance due on inventory to be paid when said inventory book is extended and footed by . . . ." Baker v. Shaw, 122 P. 611, 613 (Wash. 1912). Nothing in the contract implies a right to unilaterally withdraw from it and receive back the deposit amount, which we conclude Plaintiffs forfeited by repudiating the agreement.

4.    Even if Defendants' delivery of drawings may somehow have been behind the schedule envisioned in the contract's May 30 completion, Plaintiffs accepted any such deviation. They accepted the May 10 drawing as part of an ongoing process, and approved it on May 26. This constituted a waiver of any prior default. "There are few principles of contract law better established, or more uniformly acknowledged, than that a party to an executory bilateral contract, who keeps the same in existence after a known breach by the other party and accepts further performance from the party who has committed the breach, waives the breach, in the absence of an assertion of his intention to retain the rights accruing to him as a result of said breach, assented to by the other party; and if the injured party thereafter does not make good his promises of performance, he is responsible for such failure." Lemnah v. American Breeders Serv., 144 Vt. 568, 579 (1984). In fact, when Defendants offered to perform on May 19, that accorded with the original completion date, as there is no reason to believe substantial completion, at that point, could not have been achieved by the end of May.

5.	The reasonable interpretation of the May 26 attorney letter is that it constitutes an offer of a substituted contract. "A substituted contract is one that is itself accepted by the obligee in satisfaction of the original duty and thereby discharges it. A common type of substituted contract is one that contains a term that is inconsistent with a term of an earlier contract between the parties." Restatement (Second) of Contracts § 279 cmt. a. (A novation is a form of substituted contract that brings in a new party. Id.) Defendants were within their rights to reject Plaintiffs' offer and stand on their existing contract; Plaintiffs had no right to substitution absent Defendants' assent. "To allow one party to terminate unilaterally the contract without penalty, while requiring the other party to absorb the entire loss, is to disregard another axiom of contract construction: an obligation of good faith and fair dealing is an implied term in every contract." Sullivan v. Locheam, Inc., 143 Vt. 150, 153-54 (1983).

6.	Santiago's testimony at trial that some of the fabricated components were discarded and some others were reused is entirely too vague to support a counterclaim. Any award based upon such evidence would inevitably require the court to engage in speculation. See Breding v. Champlain Marine & Realty Co., 106 Vt. 288, 297 (1934). When a party seeks an award of damages, it bears the burden of proving the relevant facts with an enough specificity that the finder of fact can "make an intelligent determination of the extent of [the] loss." Trombetta v. Champlain Fruit Co., 117 Vt. 491, 494 (1953).


NOTICE OF DECISION


For the foregoing reasons, both claim and counterclaim are dismissed. No costs awarded.


Dated at Montpelier, Vermont, _____, 20__.

_____
Judge