*CW&P Condominium v. Pelkey*, 353-6-14 Wncv (Teachout, J., Sept. 15, 2017)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                            **CIVIL DIVISION**
**Washington Unit**                                           **Docket # 353-6-14 Wncv**

**CW&P CONDOMINIUM,**
    **Plaintiff**


    **v.**


**JOHN PELKEY,**
    **Defendant**


### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### <u>Motion to Enforce Settlement Agreement</u>
### and
### ORDER

This case involves a six-unit industrial condominium building in Barre, formerly a granite shed, that has long been used for purposes related to the granite industry. The condominium Association sued one of the unit owners over disputes that had developed between them. The parties participated in mediation and reached a Settlement Agreement, which called for certain follow-up actions by both parties.

These were not completed and Defendant filed a Motion for Enforcement of the Settlement Agreement. An evidentiary hearing was held on August 31, 2017. Defendant John Pelkey (hereinafter "Pelkey") was present and represented by Attorney William B. Miller, Jr. Association President Sherman Cochran was present and the Association was represented by Attorney Eric G. Parker.

Pelkey seeks compliance with the Settlement Agreement as he understands it. The Association's officers have a different understanding of what some of the provisions call for, and the Association argues that because Pelkey refuses to comply with terms that the Association believes are required, the Agreement is unenforceable.

Based on the credible evidence, the court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

While the building at issue has been a condominium with separately owned units for many years, the Association did not function as a formal legal entity. It did not have officers, its own bank account, or regular meetings. Management of the building was informal. Three of the units were owned by Sherman Cochran and his wife, who leased them to Mr. Cochran's business company, Cochran's, Inc. Cochran's, Inc. paid the bills and taxes and collected reimbursement from the other owners for their shares.

Apparently, the various owners made decisions about property issues informally and cooperatively over several years. Two of the other units were owned by owners of Memorial Sand Blasting, which conducted a granite sand blasting business in Units 4 and 5.

In 2013, Pelkey purchased Unit 3C to use for his mobile sand blasting business, in which he does some work on site but primarily travels to customers' sites. Fairly soon, tensions developed between Pelkey and the other owners when Pelkey, as the new owner, raised issues that disturbed the status quo: there were disputes over the ownership and use of tanks that were on the property, there were leaky roof problems and parking issues, there was an area outside Pelkey's unit with accumulated debris, and there were other issues that developed. The unit owners who had been there for many years resented the demands of the newcomer, and Pelkey was frustrated with certain conditions that limited his ability to fully use his unit. Several persons connected with the Association side of the case have the same surname as Defendant, Pelkey, but the relationships between the various owners and their partners are unknown to the court.

The parties attended a long day of mediation on July 20, 2016, and reached an agreement. It was written as a Settlement Agreement and signed that day by Pelkey and by Sherman Cochran as agent for the Association, and by the parties' attorneys.[1] Paragraph One stated that it would not be effective unless signed within a specified short period of time by all unit owners. All unit owners but one signed within the specified period. The other one signed later. The Association is not claiming unenforceability based on the untimely signing of the last owner.

The facts related to the other paragraphs of the Settlement Agreement are as follows.

Paragraph 2: Payment
Under this provision, Pelkey was to receive payment of $6,750 by August 31, 2016, consisting of $2,500 to be paid by an insurance company and the balance to be paid by the Association. Pelkey received the $2,500 insurance proceeds, but has not received the balance of $4,250 payable by the Association.

Paragraph 3: Common Area and Work to Restore
There had been a dispute about an area just outside Pelkey's Unit. In the Settlement Agreement, the parties agreed that it was a common area, and agreed upon certain work that would be done to clear it out and improve it. They also agreed that the cost of such work would be borne by the Association and paid for by the unit owners in proportion to their percentage of ownership. The paragraph further provided: "CW&P and Pelkey shall jointly agree upon a local, third-party contractor who shall perform the work required by this paragraph within one hundred-twenty days."

---

[1] At some point after the dispute began Sherman Cochran became President of the Association and Brynn Pelkey became its Secretary.

It is undisputed that some partial demolition work has been done unilaterally by the Association or some unit owners, but that the specifically defined work has not been completed, and no contractor has been agreed upon as required by the paragraph. Defendant suggested the names of three possible contractors, and the Association countered with other names. Defendant agreed to both names. The Association has not responded. The Association apparently made some unilateral attempts to contact a contractor, without informing Pelkey, but no contractor has ever been agreed upon by the parties or retained to do the work.

There are apparently disagreements between the parties about whether or not certain permits are needed, but the important fact is that a third-party contractor, who could assume responsibility for such determinations, has not yet been chosen, and so nothing has been done. The evidence is that it is the Association that has not responded to Defendant's last communication. The obligation is therefore now on the Association to choose one of the two contractors that had been named by the Association and agreed to by Pelkey, and to arrange with the contractor to investigate the permit requirement situation and complete the work.

Paragraph 4:  Pelkey Roof.

The parties agree that under the condominium documents (which were not in evidence and thus not reviewed by the court), each unit owner is responsible for the maintenance and repair of the roof over that owner's unit. The roof over Pelkey's unit slopes down on one side to a point near the end, and then rises up slightly in an overhang over the roof of Memorial Sand Blasting's Units 4 and 5, which have a flat roof. There is about one inch of vertical "wall" between the underside of the overhang of the Pelkey roof and the flat roof of the Memorial Sand Blasting's Units.

Prior to the Settlement Agreement, the Pelkey unit roof was in some disrepair and water ran down that roof onto the flat roof of the Memorial Sand Blasting Units. The flat roof is a rubber membrane that was typically reasphalted every two years. Nonetheless, there had apparently been leaks for a number of years, and the MSB interior ceiling had become wet and weak such that a ceiling crane in the MSB units could no longer be used.

Under Paragraph 4, "Pelkey shall, at his expense, retain Andy Emerson to inspect the Pelkey roof system in the area of the cupola to determine whether deficiencies in this area are resulting in leaks that channel water into the Pelkey unit and then into Unit 4. If Emerson determines that such deficiencies need to be remedied, Pelkey will do so at his expense within one hundred twenty days of the date of this Agreement."

Pelkey retained Andy Emerson to do this work. Mr. Emerson testified at the hearing. Based on his testimony, which was credible, the court finds that he found that significant portions of the Pelkey roof needed replacement and that some repairs were needed on the portion that did not need replacing. He fully replaced 5 out of 6 or 7 sheets of corrugated metal, completed needed repairs on the remaining 1 or 2 sheets, and installed a new ridge cap.

3

Other evidence established that since these repairs were completed, the flow of water onto the Memorial Sand Blasting roof has significantly decreased. There may still be a leak in the MSB roof. Michael Pelkey, from MSB, testified that he believed that this was because the current Pelkey roof still has pin holes in it and water runs through the pinholes and along the underside of the corrugated metal and spills out onto the MSB flat roof. The court finds that this theory is not supported by credible evidence. Although there are visible rusty spots on the Pelkey roof, the credible evidence is that those are surface rust on the corrugated metal, most of which is new roofing, rather than holes that allow water to permeate below the corrugated metal.

The court finds that Pelkey fully satisfied his obligation under Paragraph 4. This does not mean that there is not still water getting through the flat MSB roof. However, to the extent there is, the cause is unknown. It could have to do with the vertical one-inch wall between the two levels of roof, but there is insufficient evidence to establish that this is so; it could be something in the MSB roof itself; or it could result from some other cause. It will take further investigation to determine the cause of any remaining leak in the MSB roof. Under Paragraph 4, Pelkey was not required to stop all water leaks into the MSB units from whatever cause and become a guarantor of a tight roof over the MSB units. He was only required to fix the roof over his own unit, and he has done so satisfactorily.

The Association claims that he never informed it of when Andy Emerson was coming to do the work, but under the terms of Paragraph 4, Pelkey had no obligation to do so. His obligation was to have Andy Emerson decide what needed to be done to fix his roof and do it, and this obligation was satisfactorily completed.

Paragraph 5: Good Behavior—Future Disputes.
The primary dispute between the parties is over the obligation created by this paragraph. It reads in its entirety as follows:

> On behalf of themselves, their successors, heirs and assigns, CW&P, its unit owners, and Pelkey shall enter a written agreement which shall be recorded in the land records requiring that each party take no action to interfere with or infringe any other party's rights to the quiet enjoyment of their units or use of the common areas as provided by the bylaws, declaration and Association lawful rules. Furthermore, in any action to enforce this obligation, the substantially prevailing parties shall recover their cost of litigation, including reasonable attorney's fees.

Both parties recognize that this paragraph is an agreement to create and be bound by a 'second agreement.' They differ greatly on the content of the 'second agreement.' Each submitted to the other a document reflecting that party's proposal to fulfill this obligation. Pelkey's document was simple and tracked the language of Paragraph 5. The Association's document (Exhibit C) consists of over two pages and includes a detailed list of specific provisions on particular subjects such as locking windows and doors, insurance coverage, permitted uses, parking rules, and the like.

4

Paragraph 5 is unambiguous that the 'second agreement' shall have two key components: (1) an agreement not to interfere with rights "*as provided by the bylaws, declaration and Association lawful rules*" (emphasis added), and (2) a provision for attorneys' fees to the substantially prevailing party in any enforcement action. The version proposed by Pelkey is the version that properly fulfills the requirements of this paragraph. The document created is to be recorded in the land records. A document for the land records would not normally include the kind of operational detail that might need to be changed on an ongoing basis over time as day-to-day circumstances change, such as is included in the Association proposal. The terms of Paragraph 5 do not mandate specific rules.

Association officers testified that they fully expected that an outcome following the mediation and Settlement Agreement was that the parties would come up with a written "Good Neighbor Policy" setting forth specific operational rules that would enable the parties to get along and know what to expect from each other on a day-to-day basis. In Exhibit D, Pelkey's lawyer wrote that Pelkey "recognizes and acknowledges the condominium association's right under the condominium documents and Vermont law to pass and implement such rules. Vermont statutes specify the procedure to be followed in implementing these rules." The court finds that there exists an opportunity to make day-to-day operational rules through rule-making. That process may be undertaken by the Association, but it is not required by Paragraph 5, which only requires a 'second agreement' with the terms specifically included in Paragraph 5.

Other provisions.
There are other provisions called for in the Settlement Agreement, such as exchange of releases and dismissal of the case, but these are obligations to be fulfilled only after the completion of the terms discussed above.


**Conclusions**


The court concludes that there is no ambiguity in the Settlement Agreement with respect to the obligations surrounding either the Pelkey roof or the 'second agreement.'

The Pelkey roof obligation to the extent defined by the Settlement Agreement has been fulfilled. There may remain some level of leaking in the MSB flat roof, but the cause is unknown and needs to be investigated before it can be determined what repairs are needed and where the responsibility for any such repair lies. It is not Pelkey's obligation under Paragraph 4 to undertake that investigation. The obligation for investigation is with MSB as it is its own roof that is leaking, and Pelkey's obligation as defined by the Settlement Agreement has been satisfied.

Paragraph 5 specifies that the 'second agreement' to be created to record in the land records is a simple one requiring compliance with bylaws, the condominium declaration, and "*Association lawful rules*" (emphasis added) and requiring a provision for attorneys' fees related to enforcement actions. It is understandable and reasonable

5

that the Association wants to put a "Good Neighbor Policy" in place in the form of more specific rules, and it is reasonable that Association officers would anticipate that this might take place as a follow-up to the Settlement Agreement. However, creation of such rules does not belong within the 'second agreement' itself, but rather should be done by the separate rule-making process. See 27 V.S.A. § 1307 ("Each apartment or site owner shall comply strictly with the bylaws and with the administrative rules adopted under them) and *id*. § 1319(a)(9) (explaining contents of bylaws including "Method of adopting and of amending administrative rules and regulations governing the details of the operation and use of the common areas and facilities"). An agreement to make a further agreement with content that is supposed to be specific but is unknown would not be enforceable. To be enforceable, the essential terms of a contract must be specified. See 1 Williston on Contracts § 3:2 (4th ed.) (noting that one of the requirements of an enforceable contract is that "the essential terms of the agreement are sufficiently definite"); *Quenneville v. Buttolph*, 2003 VT 82, ¶ 16, 175 Vt. 444 ("[W]hile a binding agreement need not contain each and every contractual term, it must contain all of the material and essential terms."). "[T]he so-called 'contract to make a contract' is not a contract at all." *Herbert v. Boardman*, 134 Vt. 78, 84 (1975) (quoting 1A. Corbin, Contracts § 29, at 85 (1963)). However, the Association can undertake rule-making at any time.

The 'second agreement' required by Paragraph 5 is the simple declaration proposed by Defendant that states the essential terms that are set forth in Paragraph 5. That is, the parties' obligation is to abide by terms from 3 sources: bylaws, declaration, and Association rules, and attorneys' fees to the prevailing party are established as a consequence of noncompliance.

The Association has the opportunity to follow the necessary procedures for creating more specific rules that would include the level of detail that the Association has proposed in Exhibit C. Those are not terms to be included in the Paragraph 5 'second agreement,' but rather to be developed through the separate rule-making process. It is not a *requirement* of Paragraph 5 that this occur, but it can occur independently of the Settlement Agreement, and once any such rules are properly adopted, they become "*Association lawful rules*" that are subject to the provisions of the 'second agreement' and enforceable as such.

Based on the foregoing, the court finds that Defendant has proved a right to enforcement of the Settlement Agreement as follows:

1. Defendant is entitled to immediate payment of $4,250 from the Association;
2. The Association is required to select within 15 days one of the two contractors Pelkey agreed to (Ken Randall or Roger Beaudet) to do the work in the common area, to contact the contractor and notify Pelkey when and if the contractor agrees to do the work, and to arrange for the contractor to determine what, if any, permits are required and complete the work; and
3. The parties are required to complete, within 15 days, the 'second agreement' with the content proposed by Defendant's counsel.

6

The problem of the possible continuing leak on the MSB flat roof remains to be resolved, but is not within the scope of this case.

The Association may proceed with rule-making to create specific operational rules, but the specific terms of any rules are not within the scope of the Settlement Agreement. Rule-making does not need to be completed within the scope of this case.

Defendant's request for attorneys' fees is denied, as the provision on which he seeks to rely is not yet in effect: the present dispute is not an enforcement action related to the to-be-executed 'second agreement.' However, if the Association fails in the future to meet its obligations as clarified herein, attorneys' fees may possibly be available as a violation of the covenant of good faith and fair dealing.

**ORDER**

Based on the foregoing,

1. The Motion to Enforce is *granted,* and

2. The case is hereby *dismissed with prejudice.*

Dated this 14th day of September 2017.

_____
Mary Miles Teachout
Superior Court Judge

7