Middlebury Equity Partners v. MWJ Siam, No. S0391-04 CnC  (Katz, J., Feb. 15, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:

SUPERIOR COURT
Docket No. S0391-04 CnC

MIDDLEBURY EQUITY PARTNERS, LLC

v.

MWJ SIAM, INC.

ENTRY

This foreclosure action involving a Burlington restaurant raised a number of estoppel and fraud counterclaims asserted by the mortgagor

restaurant owner.  Mortgagees dispute that their acts constitute misrepresentations, seek to dismiss the counterclaims, and advance foreclosure proceedings.

There are several tangentially related business transactions that provide context to the current dispute.  Wanvadi Jotikasthira and Manatat Waiwong formed a partnership, PJ Associates, and a corporation, MWJ Siam, Inc, to start a Thai restaurant in Burlington.  In 1994, the two obtained a bank loan to purchase a building and equipment for the restaurant through Banknorth.  For security, the business gave the bank a mortgage to the property.  Waiwong and Jotikasthira also gave their own personal obligations.  The restaurant was a successful business, but a series of disputes arose between Jotikasthira and Waiwong that led to litigation and dissolution of their partnership.  To keep the restaurant going, Jotikasthira bought Waiwong out and convinced the bank to release Waiwong from the mortgage in 2002.

After this, Jotikasthira, through MWJ Siam, re-opened the business but struggled, as borrower, to make mortgage payments.  By early 2003, the borrower had fallen behind in payments, accumulating $30,000 in past due amounts.  In March, however, the borrower worked to bring its outstanding balance down and made several substantial payments.  By the summer of 2003, the amount past due had shrunk significantly, but not completely, and was beginning to grow again.  Around this time, the bank chose to accelerate the mortgage and sell the note to a third party.  On June 24, 2003, the bank's attorneys sent a letter to the borrower notifying it that because the mortgage was past due, the bank had elected to accelerate the loan.  This, explained the letter, meant that the total outstanding amount of the loan, $223,000, was due, and that the bank intended to proceed with foreclosure.  The letter also stated:

> At the sole option of the Noteholder, partial payments may be accepted to reduce the amount owed, but only a written agreement between the Noteholder and the Borrower shall alter the demands made in this letter. Acceptance by Noteholder of any payment in an amount less than the total payoff after the date of this letter shall not operate to extend the time of payment of any amount then remaining unpaid or constitute a waiver of any of its rights.

In July, the borrower received a computer generated past due notice from the bank stating that the borrower had a past due amount of $8,800. MWJ Siam sent a check for $2,000 to the bank to reduce this amount. The bank returned the money with a note for the borrower to contact the loan officer. In August, the borrower contacted the bank by e-mail. A representative of the bank wrote that the mortgage was being sold and that payments should be held as the new owner would bill the borrower directly but would also retain all rights previously held by the bank. Meanwhile, the bank continued to send computer generated statements showing the steadily growing amount past due. The borrower received such monthly statements from July through November. In November, Middlebury Equity purchased the mortgage from the bank and soon thereafter initiated this action for foreclosure.

Foreclosure on a mortgage is an action in equity permitting a mortgagee to enforce its right to the property, to satisfy the debt owed, and thereby extinguish the debtor–mortgagor's rights to the property. See, e.g., New Eng. Educ. Training Serv. v. Silver St. P'ship, 156 Vt. 604 (1991); see generally Am. Jur. 2d Mortgages §§ 512–516. Such an action must be predicated on a failure of the mortgagor to perform the mortgage agreement. 4 J. Backman, Powell on Real Property § 37.37[3] (1999). Defaulting on a payment or part of a payment is just such a breach. See

Merchant's Bank v. Lambert, 151 Vt. 204, 206 (1989) (discussing bank's role in party's default and resulting foreclosure).  In this case, the bank's original note included an acceleration clause, a condition long standard in mortgage documents.  Cf. Freedley's Admx. v. Manchester Marble Co., 99 Vt. 25, 35 (1925) (noting that acceleration of payments was separate from a foreclosure action).  This clause permitted the bank to accelerate the mortgage if the borrower defaulted on an installment payment so that the entire principal sum becomes due.  Once a mortgage is so "accelerated," the total amount is due, and the mortgagor can avoid foreclosure only by paying the total outstanding mortgage.  4 Backman, § 37.37[3] (citing to sample cases); Am. Jur. 2d Mortgages § 488 ("The proposition is accepted without dispute that a stipulation in a mortgage providing that the whole debt . . . is to become due and payable upon the failure of the mortgagor to pay the interest or any installment of principal . . . is a legal, valid, and enforceable stipulation.").

Thus, when the bank gave the borrower notice of acceleration and its intent to foreclose on the mortgage, it ended the borrower's right to satisfy the debt by installment payments, and the borrower's outstanding debt went from the past amount due to the entire remaining balance.  The borrower does not challenge the bank's right to accelerate payments on the mortgage.  Indeed, the borrower's default status and the language of the mortgage agreement's acceleration clause gave the bank every right to accelerate.  Likewise, the borrower does not challenge Middlebury Equity's assigned right to accelerate and foreclose based on the contract.

What the borrower argues is that the computer statements issued after the notice of  acceleration and intent to foreclose represented a kind of "workout offer" or equitable equivalent, under which the bank backed off

its prior right to acceleration and reverted to an installment payment program.  See 4 Backman, at § 37.35 (describing a "workout" wherein a mortgagee agrees to a new payment schedule in lieu of foreclosure with the defaulted mortgagor).  This then induced the borrower to rely on the old installment payment plan and not prepare for an imminent foreclosure.  The argument is one of promissory estoppel.  This doctrine states that a court will enforce a promise if the promisor reasonably expects to and actually does induce action or forebearance in the promisee.   Foote v. Simmonds Precision Prods. Co., 158 Vt. 566, 573 (1992) (quoting from the Restatement (Second) of Contracts § 90.

The problem with applying this argument is that it ignores the plain language of the bank's notice of acceleration quoted above.  The acceleration letter makes clear that any type of restructuring or "workout" that would renew installment payments would have to be the result of a written agreement between the mortgagor and mortgagee.  Cf. Standard Chartered Bank v. Red Rock Commodities Ltd., 151 F.R.D. 261, 263 (S.D.N.Y. 1993) (noting that an alleged promise extending financing was not meritorious where the loan document stated it could only be modified in writing).  This is consistent with the general function of workouts as agreements between parties to restructure loans to avoid foreclosure.  4 Backman, at § 37.35 (noting that the form workouts take are endless and limited only by the "imagination and nerve of the parties").  Here the bank made clear that it did not intend to alter its acceleration and foreclosure actions, and to the extent it reserved its right to do so, nothing short of a written agreement between the parties would suffice.

Why, then, would the bank, after its clearly stated intent to limit renegotiation, suddenly revert to the old installment schedule without

notice, consideration, or explanation?   The borrower argues that a computer-generated, automatic notice created a kind of unilateral alternative offer.  But this interpretation flies in the face of a cardinal rule of contract interpretation that requires courts to interpret such offers within the context of their circumstances.  Isbrandtsen v. North Branch Corp., 150 Vt. 575, 578 (1988).  Any subjective beliefs that borrower formed upon receiving regular monthly computer statements are irrelevant.  Quenneville v. Buttolph, 2003 VT 82, at ¶ 15.  Those statements lack any signal of intent that would reasonably suggest that they represented such offers or waivers of its clear acceleration.  Furthermore, the bank displayed no such intent as to make such statements suffice as even unilateral offers.  See Starr Farm Beach Campowners Ass'n v. Boylan, 174 Vt. 503, 505 (2002) (mem.) ("An enforceable contract must demonstrate a meeting of the minds of the parties: an offer by one of them and an acceptance of such offer by the other.").

The bank's August e-mail communications do nothing to undermine these conclusions.  While they do not state the bank's position with the same clarity as the June acceleration letter, they do not mislead about the state of the mortgage; they do not back off acceleration.  For example, one of the borrower's inquiries was about the bank's refusal to accept installment payments in July.  The bank responded that it was no longer accepting payments because it was selling the loan, as its default status was too high a risk.  This fact is undisputed.  Further, the bank suggested that the borrower save the payments for the purchaser, who the corresponding bank employee seemed to believe would offer the borrower some kind of workout.  When Middlebury Equity chose instead to enforce the acceleration clause and commence this foreclosure, the borrower may have been disappointed, but that cannot be attributed to a promise or false

statement in the bank's e-mails because the employee's statements merely suggest the possibility but do nothing to promise it. It is important to keep in mind that proper interpretation of this correspondence is an objective question, not driven by the subjective reaction of the debtor. Green Mt. Inv. Corp. v. Flaim, 174 Vt. 495, 497–98 (2002) (noting that the reliance must be reasonable, that a promise is enforced only if injustice can be avoided and emphasizing the latter as a question of law).

This leaves us with the question of whether the July-through-November, computer generated bank statements represent a type of promise which fairly induced some kind of reliance in the borrower. As an equitable doctrine, promissory estoppel's application is dependent on justice, fairness, and reasonableness. E.g., Remes v. Nordic Group, Inc., 169 Vt. 37, 40–41 (1999) (discussing promissory estoppel's principles in the context of damages). Given the context in which the borrower received the statements—where the borrower was rebuilding and believed themselves to be on the road to solvency—there is an argument to be made that the bank statements were confusing. Any such confusion, however, should have been more than adequately cured by a re-reading of the acceleration notice and the bank's consistent refusal to either accept installment payments or re-negotiate their reinstatement. In other words, the bank statements do not represent a promise to the borrower contrary to the acceleration notice. To read otherwise would elevate a confusing gesture above the bank's additional actions and statements which contradict the borrower's proffered interpretation. To further conclude that these computerized bank statements represented a unilateral promise to return to the original defaulted installment plan would be unjust to the bank and its rights under the mortgage agreement.

Beyond this, it is also unclear what reliance was induced by the bank's computer statements. The borrower argues that it relied on the bank statements to its detriment but has some difficulty identifying the detriment. To the extent that the borrower is arguing that its reliance prevented it from obtaining the entire mortgage amount, there is no detriment as the borrower has been and is still able to do exactly that. The statutes of redemption allow a mortgagor to redeem its rights in the property up to six months after foreclosure. 12 V.S.A. § 4528. As this right to redeem still continues, borrower fails to show a detriment. Instead, it argues that if it had known that foreclosure was looming, it would have scraped the past amount due together and would have brought its balance current, before the sale to Middlebury Equity. This is something the borrower was already obliged to do, foreclosure notwithstanding, and the bank statements did not prevent it from doing so. The fact that the bank refused to accept even partial payment goes to the larger point that the bank had accelerated the mortgage on June 24th and that made the whole amount due. Thus, even if the borrower had raised the $12,000 it had past due and the bank had accepted it, this would not have cancelled the acceleration. Cf. 4 Backman, at § 37.37[3] n. 15–17 (citing to states with statues that do allow for mortgagors to cancel accelerations in this manner). The remaining $211,000 would still have been due and Middlebury Equity's right to foreclose would be the same. The loss of an opportunity in this sense is not actionable under law or equity. Ragosta v. Wilder, 156 Vt. 390, 396 (1991) (action or inaction taken in reliance must be "of a definite and substantial character"). Moreover, even had borrower overcome the acceleration issue, it has made no factual showing to support her conclusory implication of detriment merely from having "arranged" for the loans.

We therefore conclude that borrower has failed to establish the

elements necessary for a promissory estoppel claim.  As well, this discussion also demonstrates the failure of borrower to establish the evidence of negligent misrepresentation.  Hedges v. Durrance, 2003 VT 63 (negligent misrepresentation requires the tortfeasor to supply false information that another party relies upon).  Here, none of the information that the bank provided was false.  While the computer-generated statements were misleading, their damage was more than adequately corrected by their context and by the lack of reliance by borrower.

Borrower claims that the computer-generated  statements breached the implied covenant of good faith and fair dealing  Carmichael v. Adirondack Bottled Gas Corp., 161 Vt. 200, 208–09 (1993) (quoting the Restatement (Second) of Contracts § 205 cmt. d to define bad faith as "harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract"). We do not see, as a matter of law, that the computer-generated bank statements are the factual equivalents of harassing behavior or willful failures, which would violate the clause of good faith and fair dealing.  At worst these statements are the product of a lack of oversight by the bank—a note of confusion dropped into a tense business situation—but they lack the purposefulness of Adirondack Gas. Id. at 210–11 (company's harassing demands, short deadlines, and ambiguous prior dealings created a question of good faith and fair dealing for the jury).  There simply is no evidence of harassing behavior, exploited ambiguities, or rejection of borrower's advances for unexplained or unjustified reasons.

This leaves us with borrower's sole remaining claim of consumer fraud.  The claim is essentially that the borrower relied on the bank statements to form a misrepresentation that the bank had silently rescinded

the acceleration and foreclosure. Assuming for the moment that the borrower did rely on such bank statements, since there is no evidence that the borrower was damaged, Russell v. Atkins, 165 Vt. 176, 181 (1996) (parties must have either relied on or been damaged by the misrepresentation), there is no reason to conclude that the bank statements had the capacity to deceive or that the borrower's interpretation of the statements was reasonable. Carter v. Gugliuzzi, 168 Vt. 48, 56 (1998) ("Deception is measured by an objective standard, looking to whether the representation or omission had the 'capacity or tendency to deceive' a reasonable consumer."). Despite the borrower's characterizations, the bank statements can best be described as having the capacity to confuse. Any confusion, however, is greatly lessened when put in the context of the situation.

Despite its efforts to cure default, the borrower owed past due amounts on its mortgage. In June, it received a letter from the bank accelerating the mortgage—bringing the total amount due—and notifying of its intention to foreclose. The letter also tells the borrower that this situation would not be modified by any act short of a written agreement between the two parties. For the next few months, borrower receives computer-generated bank statements akin to the kind it had received prior to the acceleration letter, but this time when it tries to make partial payments, the bank refuses to accept them and notifies borrower that it is selling the mortgage to another party who may accept the payments but who has the same rights (including foreclosure) that the bank has. From this borrower suggests it was perfectly reasonable for it to believe that the bank had stopped the acceleration and returned to its prior installment system. This is simply not a reasonable conclusion.

Given the vast array of contradictory facts, borrower's alleged subjective belief that the computer statements constituted a rescission of acceleration were more of a hope, which at best exaggerated some potential confusion latent in the computer statements. Apart from this subjective interpretation, the statements simply do not have an objective capacity to deceive, nor did give a reasonable misrepresentation within the context of the bank's legitimate acceleration and foreclosure. In the context of the bank's original acceleration letter and latter e-mails, the only objective reading must be that acceleration remained the status of the debt.

We are further troubled by the concept of a consumer fraud claim arising out of a commercial loan. The borrower cites to several out-of-state cases and one Vermont superior court decision to support the idea that a loan is a "service" within the definition of 9 V.S.A. § 2451a (b). With one exception, the cases cited by the borrower deal with consumer loans— either credit cards or home mortgages. The sole exception comes from a federal case interpreting a South Carolina statute with different terminology than Vermont's. Compare McTeer v. Provident Life and Acc. Ins., 712 F. Supp. 512, 515 (D.S.C. 1989) (defining terms "trade" and "commerce"), with 9 V.S.A. § 2451a (b) (defining the equivalent terms "goods" and "services"). The conclusion that mortgages are a "service" is far from universally accepted. D. Zupanec, Annot., Scope and Exemptions of State Deceptive Trade Practice and Consumer Protection Acts, 89 A.L.R.3d 399, at § 9 [f] (1979, 2004 Supp.); M. Evans, Annot., Who Is a "Consumer" Entitled to Protection of State Deceptive Trade Practice and Consumer Protection Acts, 63 A.L.R.5th 1, at § 7 (1998).

The fact that some courts have interpreted their particular state's variation of consumer fraud law to allow individual claims against a bank is

not an open-ended proposition for all banks and all possible consumers. Consumer fraud acts were designed "to prevent fraud and deception in consumer transactions."  89 A.L.R.3d at 399.  In Vermont, the statutory language favors claims against discrete transactions where something is bought, such as a tangible object, or sold, such as a discrete service.  See, e.g., <u>Carter</u>, 168 Vt. at 52–53.  Mortgages do not easily fit under this umbrella concept of "services" as it is at once a broader "service" and involves the exchange of intangible property "rights" defined by statute.  12 V.S.A. §§ 4528–4533.  Commercial loans are even more difficult as they involve business-to-business transactions, which suggests more sophisticated parties, greater leverage for negotiation, and more complex terms and transactions.

Notwithstanding the liberal nature of the Consumer Fraud Act, this case simply does not support an action where the activities complained of were, at best, irregularities, isolated elements of a larger, straightforward relationship.  See <u>Bloomberg v. Farm Bureau Life Ins. Co. of Michigan</u>, 438 N.E.2d 1247, 1250 (Ill. 1982) (rejecting consumer fraud claim against mortgagee for isolated breaches of contract and "farfetched" theories of "deviant behavior").  We decline for this reason as well to apply the Consumer Fraud Act to the bank's failure to stop sending computer statements of the borrower's lapsed installment payment plan.

Based on the foregoing, Middlebury Equity and Banknorth's motions to dismiss are granted.  MWJ Siam's counterclaims are dismissed.

Dated at Burlington, Vermont_____, 2005.